## INTERSTATE COMMERCE COMMISSION v. CHESAPEAKE & OHIO RY. CO. et al.

(Circuit Court, W. D. Virginia. February 19, 1904.)

1. CARRIERS—INTERSTATE COMMERCE ACT.

Where a carrier owes an ascertained sum of money, which is a legally enforceable debt, it is not a violation of the interstate commerce act for it to pay such debt by carriage done for the creditor at its legally established rates.

2. SAME—UNJUST DISCRIMINATION—SALE AND CARRIAGE OF COMMODITY AT A LOSS.

It is not a violation of section 2 of the interstate commerce act for an interstate carrier to buy a commodity, and then sell the same, to be transported over its own line, at a price less than the aggregate of the cost, expense items, and its own published freight rates, unless such transaction was a mere device to cover an intentional giving of a less rate for carriage to some than to others; there being no legal ground for assuming that the loss was sustained by it as a carrier, rather than as a dealer.

3. SAME—UNDUE PREFERENCE OR ADVANTAGE.

Defendant railroad company, an interstate carrier, contracted to furnish to another railroad company not to exceed 2,000,000 tons of coal from its line at a fixed price; the same to be delivered to the purchaser at designated ports on the Atlantic, as required by it, each month, during a term of five years. To fulfill the contract, defendant was to buy the coal from mines along its line, transport it to the seaboard over its own line, forward by water, and discharge into the bins of the purchaser. In performing the contract from the beginning, the cost of the coal to defendant, added to the cost of transportation and discharge beyond its own line, and the freight over its own line at the published rates, exceeded the price received by a substantial sum, averaging 23 cents per ton. It was shown that, during the continuance of the contract, other coal was shipped from the same mines over defendant's road, and forwarded by water to dealers or consumers at the same ports where defendant made deliveries under its contract. Held, that the performance of the contract operated to give the purchaser an undue preference or advantage, or to subject some one or more of the parties concerned in the other sales and shipments to undue prejudice or disadvantage, in violation of section 3 of the interstate commerce act, and the contract was therefore illegal and unenforceable.

4. SAME.

Such contract being illegal, a claim by the purchaser for damages for its breach, by the failure of defendant to furnish the quantity of coal called for thereunder, was also illegal and unenforceable; and a further sale and shipment of coal by defendant in settlement of such claim at the contract price, which was at the time much less than the aggregate of the

cost items and defendant's published freight rates, subjected others concerned with the shipment of coal between the same points to undue prejudice or disadvantage, in violation of section 3 of the interstate commerce act, and the further performance of an agreement for such sale and shipment will be enjoined.

In Equity. Suit for injunction.

Wm. A. Glasgow, Jr., and Thos. L. Moore, Dist. Atty., for complainant.

Harrison & Long, for C. & O. Ry. Co.

Jno. W. Griggs and Daniel & Harper, for N. Y., N. H. & H. R. Co.

McDOWELL, District Judge. This case arises from a bill filed by the Interstate Commerce Commission, praying an injunction. In brief, the bill alleges that the Chesapeake & Ohio Railway Company—to be hereinafter styled the C. & O.—is carrying and intends to continue to carry coal at less than its published tariff rates for the New York, New Haven & Hartford Railroad Company, and is committing an illegal discrimination in favor of that company. Both defendants have answered, denying any violation of the interstate commerce act (Act Feb. 4, 1887, c. 104, §§ 2, 6, 24 Stat. 379, 380 [U. S. Comp. St. 1901, pp. 3155, 3156]).

On December 3, 1896, the following agreement was made. The body of the paper is partly printed and partly typewritten, and in the following copy the typewritten portions are in italics:

"Form E. 27.

"Contract made between the *Chesapeake and Ohio Ry. Co.* of ...... and The New York, New Haven and Hartford Railroad Company.

"Said *Chesapeake & Ohio Railway Co.* ...... for the consideration hereinafter mentioned hereby agrees to furnish ...... to ...... said Railroad Company *not to exceed two million gross tons of bituminous coal from its line in such quantities monthly as wanted from July 1, 1897, to July 1st, 1902, without charge for demurrage. Deliveries to be made not exceeding four hundred thousand tons per annum.*

"And said *Chesapeake & Ohio Railway Company* ...... further agrees that all said *Bituminous Coal* ....... shall be of the best quality ...... first-class in every respect, and satisfactory to said Railroad Company *and said Railway Company has the right to terminate this contract at any time if said bituminous coal be of poor quality, or if its delivery be unnecessarily delayed* ......

"And said ...... *Chesapeake & Ohio Railway Company* ...... further agrees to deliver all said *bituminous coal* ...... to said Railroad Company *in its bins at such ports upon its line as required by the monthly requisitions of its Purchasing Agent.*

"In consideration of the faithful performance by the said *Chesapeake & Ohio Ry. Co.* ...... of all its agreements herein contained, said Railroad Company agrees to pay for said *bituminous coal* ...... at the rate of *two and seventy-five one-hundredths dollars per gross ton New Haven basis.* Settlement to be made ...... *Monthly* ......

"*Said Railway Co. has the right to cancel any and all portions of said quantity of bituminous coal remaining undelivered on July 1st, 1902.*

"Witness the names of the parties hereto this the third day of Dec. 1896.

"[Signed]                  Chesapeake & Ohio Ry. Co.
                            "By M. E. Ingalls, Pres't.

"[Signed]    The New York, New Haven & Hartford Railroad Company,
                            "By C. S. Mellen,
                            "Second Vice President.

"*For value received, I hereby guarantee that the Chesapeake & Ohio Ry. Co. shall not fail to deliver coal on account of strikes.*

                            "J. Pierpont Morgan."

Under this contract the C. & O. delivered between July, 1897, and July, 1902, much the greater part of the 2,000,000 tons, but at the expiration of the time fixed in the contract there were still some 59,966 tons not delivered.  Owing to a strike of the coal miners of both the New River and Kanawha fields then in force, the C. & O. was unable to supply the shortage, and the New Haven Company purchased the requisite amount where it could, and later presented a bill to the C. & O. of something over $103,000 for the excess of the cost of the coal thus purchased over the price agreed upon in the contract above set out.

In April, 1903, a verbal agreement was made between the two companies to the effect that the C. & O., in lieu of paying this bill of damages, would compromise the claim by delivering the 59,966 tons of coal at the price named in the contract of 1896.  At the time of this last agreement the cost of the coal at the mines and the cost of vessel freight were much higher than in 1896.  The following table (No. 1) shows the time of shipment, number of tons delivered under this verbal agreement, the cost of the coal at the mines, the water freights, discharging costs, insurance, and the price received for the coal (which is somewhat more than $2.75 per ton, as deliveries were made at ports other than New Haven).  During this period the published tariff rate of the C. & O. on such coal was $1.45 per ton from the Kanawha field, in West Virginia, where this coal was obtained, to Newport News, Va. Table No. 2 shows the loss to the C. & O. on these deliveries of 1903.

Table No. 1.

| Date. | Tons  Delivered. | Cost at Mines. | Water Freight. | Dischar- ging. | Insur- ance. | Price Rec'd. | C. & O. Freight at $1.45 |
|---|---|---|---|---|---|---|---|
| 1903  May | 17627 tons & 2160 lbs. | $22,563.79 | $16,429.60 | $4,107.66 | $176.28 | $ 49,455.04 | $25,560.45 |
| "   June | 16141  "   & 1870  " | 20,661.48 | 14,042.01 | 3,722.17 | 161.43 | 45,224.63 | 23,405.66 |
| "   July | 4309  "   & ——  " | 5,515.52 | 3,878.10 | 1,077.25 | 74.35 | 12,108.29 | 6,248.05 |
| Totals, | 38078  "   & 1790  " | $48,740.79 | $34,349.71 | $8,907.08 | $412.06 | $106,787.96 | $55,214.16 |

Table No. 2.

| Date. | Total Costs Exclusive of C. & O. Freight. | Total Rec'd. | Balance. | Loss to C. & O. |
|---|---|---|---|---|
| 1903  May | $43,277.33 | $ 49,455.04 | $ 6,177.71 | $19,382.74 |
| "   June | 38,587.09 | 45,224 63 | 6,637.54 | 16,768.12 |
| "   July | 10,545.22 | 12,108.29 | 1,563.07 | 4,684.98 |
| Totals, | $92,409.64 | $106,787.96 | $14,378.32 | $40,835.84 |

Further deliveries were stopped by the service of a temporary injunction issued on the bill in this case.

The published freight rate of the C. & O. on coal per ton from the New River (West Virginia) field, from which field came all the coal delivered prior to 1903, to Newport News, Va., destined for points beyond the Capes of Virginia, were from March 8, 1899, to January,

1903, as shown by the following table.   There is no disagreement as to these rates.

March 8, 1899  ...............................................$ .90
May  13, 1899 ...............................................  .80
Jany. 17, 1900 ...............................................  .85
Feb.   1, 1900 ...............................................  1.00
April  2, 1900 ...............................................  1.15
April  1, 1901, to Jan. 1903 ...............................................  1.25

There is a disagreement as to the rates in force from July 1, 1897, to March 8, 1899.   The complainant contends that the rates applicable to the coal delivered during this period are the local rates—$2 per ton from July, 1897, to January, 1899, and $1.55 per ton during January and February, 1899.   The C. & O. contends that it had duly established and in force from July 1, 1897, until January 2, 1899, a through rate of $2.25 per ton; of $2 per ton on January 2, 1899; and of $1.75 per ton from January 3, 1899, until March 8, 1899.   There is evidence that at least one of the through tariff sheets (C. & O. 5,177) is not on the files of the Interstate Commerce Commission, but there is also testimony that this sheet was duly mailed to the then auditor of the commission.   Another objection to this sheet is that it applies, as stated thereon, only to coal destined for New York City. While there is room for doubt as to the proper construction of these through tariffs, it seems to me unnecessary to settle these questions. Conceding, for argument's sake, that the contention of the C. & O. is sound, still the part of the through rate applicable to the C. & O. for carriage from the coal field to Newport News on the coal in question was the difference between the through rate and the (varying) aggregate of the costs of vessel freight, marine insurance (paid by the C. & O.), and the cost of discharging.

To illustrate:  In July, 1897, the average cost per ton for vessel freight
    was .............................................. 65.1c
Cost of discharging was ........................................ 22.6
Insurance was ............................................ 00.8
                                                              _____
    Total .............................................. 88.5c

As the through rate was $2.25 per ton, it follows that the C. & O. freight rate on such coal for that month was $2.25 minus 88.5 cents, or $1.365, per ton.

Now, the cost of the coal per ton was.................................. 70c
And the average price per ton received from the New Haven Company.. $2.845

The cost items, when added, are:

"Water costs" per ton.......................................... $ .885
C. & O. freight:  "  ..........................................  1.365
Cost of coal at mines ............................................  .700
                                                              _____
    Total per ton.......................................... $2.950
The selling price being..........................................  2.845
                                                              _____
The average loss per ton was.................................... $ .105

As 28,890 tons and 1,140 pounds of coal were shipped during that month, the actual loss was $3,033.50.

On this basis, upon making the calculation, it appears that there was always a loss to the C. & O. until January, 1899.   For January

and February, and from April to and including October, 1899, there was, on the basis most favorable to the defense, a profit. That is, the price received for the coal was in excess of all cost items, including the proper C. & O. freight charge. Since October, 1899, there has always been a loss. Stopping the account at January 1, 1903, the losses exceed the gains by $301,959.13.

In addition to the foregoing loss, there is another large loss to be considered. In the answer of the C. & O. it is said that by reason of nondeliveries in 1900 and 1901, at which period all deliveries made were made at a loss to the C. & O., the latter became indebted for damages in the sum of $160,000. This damage claim was compromised by the payment to the New Haven Company of $130,000.

It is now necessary to consider and determine two disputed points as to the meaning of the contract above set out. It is remarkable that in this brief contract, involving over five and a half millions of dollars, there are at least two serious mistakes, if the contract be construed as contended for by the defendants. Twice the words "Railway Company" are used where, as is insisted, the words "Railroad Company" were intended. As to the first instance, I am inclined to think that the paper should be construed as contended for by the defendants. The clause in question reads: "and said Railway Company has the right to terminate this contract at any time if said bituminous coal be of poor quality, or if its delivery be unnecessarily delayed." It does not appear that the legal advisers of either company inspected this paper when it was executed, and this error may have escaped the attention of the laymen who signed it. To read the paper in this respect as written, and as contended for by counsel for the commission, would give it an extraordinary effect. It would give the C. & O. the right to terminate the contract if the coal to be procured by it should be of "poor quality," or if deliveries to be made by the C. & O. Railway Company are "unnecessarily delayed." I cannot believe that the parties to this paper had in mind deliveries by coal operators to the C. & O. They intended, I think, to refer to deliveries to the New Haven Company at its bins at the different ports. It is true that the contract gave the New Haven Company an option as to the amount of coal, not exceeding the stated limit, it might order. But I think this clause was intended to cover the contingency of an order being made by the New Haven Company, and the coal on delivery being of poor quality, or the deliveries being unduly delayed.

In the later disputed clause, the contract, as written, gives the C. & O. the right to cancel all portions of the quantity remaining undelivered on July 1, 1902. Mr. D. H. Matson says in his affidavit that a clause reading, "Any portion of this tonnage not shipped by ———, on which date this contract will expire, shall be cancelled," or a clause permitting the seller to cancel all coal not delivered within the period provided for upon certain conditions, has been, and is, the usual course of business among dealers in coal. The proper construction of this cancellation clause is a matter of some difficulty. The parties to the contract, prior to the institution of this suit, construed it as giving, not the C. & O., but the New Haven Company, the right to cancel.

The contract as a whole is, I think, an option on the part of the New Haven Company. But I do not think the intent was to make the cancellation clause read so as to give that company the right to cancel deliveries not made prior to July 1, 1902. There was no need for such a clause. The paper only obligated the New Haven Company to pay for such coal as it called for, and as was delivered prior to that date. On the other hand, such being the custom in drawing such contracts, I think the intent was that this clause, standing alone, should be read as it is written. However, this clause must be read in connection with the guaranty. The construction of the two, read together, seems to me to be that the C. & O. need not deliver any tonnage undelivered prior to July 1, 1902, unless the failure to deliver arose from strikes. As strikes caused the nondelivery of the entire tonnage prior to July 1, 1902, I think it proper to construe the contract as the parties construed it, and hold that the cancellation clause did not of itself absolve the C. & O. from the at least apparent obligation to deliver the balance of the coal.

The next question presented for solution is whether or not the C. & O., in the transactions prior to April, 1903, was the vendor of the coal. On this point it is sufficient to say that the evidence leaves no doubt in my mind that the C. & O. was in fact the vendor of the coal. The government's contention to the contrary is wholly unsustained. Therefore we must treat it as a carrier which purchased coal at mines on its road, and delivered it to a purchaser after carrying the coal over its own line, and having it carried and discharged by vessels employed by it.

Inasmuch as no action by the court is asked because of the transactions prior to 1903, the legality of the contract of 1896 is of interest now because on its legality depends the validity of the demand made in April, 1903, by the New Haven Company that the C. & O. pay the bill of damages, of about $103,000. In the answers of both defendants the justice of this demand is asserted. This bill is alleged to be (and I find no evidence to the contrary) the actual difference between the cost of the coal purchased by the New Haven Company from others, and what would have been the cost to it, had the C. & O. fulfilled the contract of 1896. This demand, therefore, cannot properly be considered an unadjusted or vague and unliquidated claim. The inference to be drawn from Goodridge v. Union Pacific (C. C.) 37 Fed. 182, and Union Pacific v. Goodridge, 149 U. S. 690, 13 Sup. Ct. 970, 37 L. Ed. 986, is that an adjusted claim, if otherwise valid and enforceable, may be paid by a carrier by hauling for such creditor at a reduced rate; the difference between the schedule rate and the agreed rate being applied as a credit on the claim. While these opinions are obiter as to the question which we are now considering, as it did not arise in the above-mentioned case, still it seems to me that this conclusion is sound. Where a carrier owes a legal, enforceable, and ascertained sum of money, I cannot perceive that the commerce act is violated if the debt be paid by carriage done by the carrier for its creditor at the carrier's legal freight rate.

In view of the conclusion finally reached herein, no discussion is necessary of the contention that the contract of 1896 is void because

ultra vires, or because made in contravention of a certain West Virginia statute forbidding railroad companies to deal in coal. We may concede to the defense that neither of these contentions can be sustained in this case.

We are now brought to consider the validity of the contract of 1896, as affected by the interstate commerce act. In making this contract the C. & O. intended to, and did, in so far as it made deliveries prior to 1903, become the purchaser of the coal. If the commerce act was not violated by the transactions prior to April, 1903, then on that date the C. & O. was, so far as this court can say, legally obligated to pay to the New Haven Company the $103,000 claimed as damages for failure to make deliveries.

I understand from counsel that the question now presented has never been adjudicated by any federal or state court of this country, and, owing to the many demands on my time, I have not undertaken to make a search of the books. I assume that, were there any adjudications, counsel would have found them. There are two rulings of the Interstate Commerce Commission relied on by the defendants (Haddock v. Delaware, etc., Co., 4 I. C. C. Repts. 296, and Coxe Bros. v. Lehigh R. Co., Id. 535), and another (Grain Rate Case, 7 I. C. C. Repts. 33) relied on by the complainant, which I think are sufficiently unlike the case at bar to deprive them of force. But, if not, these rulings are merely persuasive, and their existence does not relieve me of the duty of reaching my own conclusions.

There is no federal statute, so far as I know, which in express terms forbids interstate carriers to become dealers in articles of transport. It is, I think properly, admitted by counsel for C. & O. that in case a carrier becomes a dealer for the purpose of giving its purchaser or any favored person a rebate, such transaction would be obnoxious to the second section of the act. On this point there is no difference of opinion. And in the case at bar I do not find anything which satisfies me that the C. & O., in making the contract of 1896, had any special design to give a rebate to the New Haven Company or to any particular coal operators. In other words, I do not find here that the contract of 1896 was intended as a ruse or device to evade the commerce act. The contract was made at a time of extreme financial depression. It appears to have been an entirely honest effort by Mr. Ingalls to find a market for coal produced on his line, made without thought of violating the commerce act. The second section of the act is directed only at charging to or receiving from some (directly or indirectly) less than is charged to or received from others for services rendered in transporting passengers or property. To arrive at the true intent of a statute, the reasons inducing its enactment, and especially the evils sought to be remedied, are to be considered. But still an intent cannot be found in a statute unless the statute contains apt and sufficient words to express or fairly imply such intent. We are now, therefore (confining ourselves to the second clause for the present), brought to consider this question: Can an interstate carrier buy and then sell articles, to be carried over its own line, at a price less than the aggregate of the cost and expense items and its own published freight rate? Always excepting cases where such dealings are mere devices to cover

128 F.—5

an intentional giving of a less rate for carriage to some than to others, it seems to me that this question must be answered in the affirmative, in so far as the second section of the act applies. If, in thus dealing in and carrying such article, the carrier credits its freight account with the published rate, we can only say that it is carrying for its vendee at a too low rate, by saying that a carrier cannot suffer, if it wishes or must, a loss as a dealer. Whether it can, or not, will be considered a little later. If the carrier, under such circumstances, does not on its books credit its freight account with its published rate, and does not charge the loss to an account kept with the article dealt in, or to income, there would be a seeming violation of the second and sixth sections of the act. But this would be at the utmost a technical violation, if it has a right to suffer a loss as a dealer, and it seems to me that it could with difficulty be considered a violation in any sense. The law is not concerned with the carrier's methods of bookkeeping. Where the dealing is not a device to evade the law, and if a carrier can legally suffer a loss as a dealer, it seems to me a matter of no moment that it go through the form of crediting its full freight earnings on the transportation account, and charging the loss on the transaction to an account kept with the article dealt in, or to some other account.

Now, to recur to the proposition that a carrier, acting in good faith, can suffer losses as a dealer without violating the second section of the act: Let us suppose that the C. & O. were to make a contract to deliver New River coal to a purchaser in New England at a price which at the time covered the cost of the coal, its own published freight charges, and all water costs. We will also assume, as we are seeking an illustration where the contract is made in perfect good faith, that neither party to the contract has any reason to suppose that the cost of the coal, or the water costs, will, during the life of the contract, advance. With the contract price equal to all cost items and the carrier's full freight rate, I cannot perceive any ground for assailing the legality of the contract, or of acts done in performing it. When the cost items increase, there is a loss to be suffered by the carrier vendor. To say that this loss is necessarily a loss on carriage, and hence a rebate on freight rates to the purchaser, seems to me to beg the question. A statute which goes no further than to forbid carrying for one at less than the price charged others is not sufficient warrant for holding that a loss suffered by a carrier vendor has to be considered as a loss on carriage. If there were a federal statute forbidding a carrier to become a dealer, or if there were a statute forbidding a carrier dealer to sell articles of transport at less than the aggregate of all cost items and its own published freight rate, or if there were a statute providing that in such cases all losses must be treated as losses on carriage, the way would be clear. But, with the law as it is, in so far as the second section of the act goes, I fail to find authority for saying that loss under such a contract must necessarily be treated as a loss on carriage. Failing to find so far any law forbidding a carrier dealer to suffer a loss as dealer, we are met always with the unanswerable proposition that the loss under such a contract can just as properly be treated as a loss suffered as dealer as it can as a loss on carriage.

It is true that at the very inception of the contract of 1896 the cost

items, and the lowest rate that seems to me possible to be considered as the legal freight rate of the C. & O., were greater than the contract price. But unless this showed the contract to be a device to evade the second section, this fact is, to my mind, of no importance. If, for instance, a carrier has purchased a large quantity of some article, intending in the future to sell and carry it, and the market price declines, I do not perceive anything in the second section that would prevent the vendor carrier in such case from suffering a loss on the article. It is true that, where at the very inception of the contract there is a loss to the vendor carrier, it is somewhat difficult to ascribe an intent to lose on the article dealt in, rather than an intent to simply carry at less than the rates given to the public. But in the case at bar I am unable to find evidence of an intent to carry at less than the published rates of the C. & O. There is no evidence that, at the time he made the contract of 1896, Mr. Ingalls knew the prices he must pay the coal operators or the water carriers. Both the contract with the coal producers and that with the water carrier were made after the contract with the New Haven Company. When the contract of 1896 was made, Mr. Ingalls may have expected to purchase the coal at so low a price, or to procure water carriage and discharging at so low a price, that the aggregate of cost items and the C. & O. freight rate would have been at least equaled by the contract price to be paid by the New Haven Company. And if such be the fact, we have a case of unexpected loss to deal with. But, even assuming that Mr. Ingalls knew the price he must pay for the coal and the water costs, and that he knew that the contract price was not sufficient to pay these costs and the C. & O. published freight rate, still it does not seem to me to necessarily follow that he intended to carry the coal at less than the published rates. To say that it does follow is to say that a vendor carrier must treat its losses on a contract of sale and carriage as losses as carrier, or as reductions of its freight rate, and cannot treat them as losses suffered as a dealer. It is true that the effect to the carrier, to its vendee, and to the public is exactly the same, whether the transaction be considered as a loss on carriage, and hence a rebate on freight rates, or as a loss suffered on the article dealt in. But this fact does not, as it seems to me, give us a right to say that such losses must be treated as losses or rebates on carriage. In other words, if a carrier may become a dealer, it may suffer losses as a dealer. And if so, except for its bearing on the bona fides of the transaction, these losses may as well be expected and contemplated losses, suffered from the inception of the transaction, as losses arising from unforeseen contingencies. I can readily believe that it was good business policy for a carrier, situated as was the C. & O. in 1896, to contract knowingly to suffer a considerable loss on even a very large contract, in order to keep a great number of mines on its line in operation. I can find no evidence in the record which satisfies me that in making the contract of 1896 the C. & O. intended a ruse or device to give a rebate on freight rates to the New Haven Company. The second section is limited in its application. It cannot be declared violated unless the transaction was a ruse or device to carry at less than legal rates, or unless there was, directly or indirectly, a carriage at a too low rate. As before re-

marked, to say that the losses suffered by the C. & O. must be treated as a carriage at a too low rate is to assert that the honest losses of a vendor carrier must be treated as reductions in freight rates, and cannot be treated as dealer's losses. To so hold is to lose sight of the carrier's relation to the transaction as vendor.

It is further said that in the case at bar the evidence shows that the C. & O. agent, on receiving payment from the New Haven Company, first paid the operators and the water carriers in full, and then turned into the C. & O. treasury, on account of freight earnings, the insufficient remnant. It is therefore contended that in fact there was in this case an actual rebate on carriage. But it does not seem to me that the result is varied by this fact. Speaking now only of a case in which there has been no intent to violate the second section of the act by some device, and of a case in which a carrier vendor has acted in good faith, it seems to me that the facts above stated make out only a seeming case of violation of the second section. The reason for this conclusion is that the law is concerned only with practical results, and is not concerned with the order in which a vendor carrier pays its honest losses, or with its methods of bookkeeping. If the C. & O. agent had first, out of the receipts from the New Haven Company, turned into the C. & O. treasury a sum sufficient to pay the full freight rates, and had then drawn on the C. & O. treasury for funds to make up the sums necessary to pay in full the demands of the coal operators and the water carriers, the practical result, to the vendor carrier, to its vendee, and to the public, of such procedure, would have been precisely the same as that of the method said to have been actually adopted. To say that the method of handling the receipts constitutes a violation of the second section is to say that the law is concerned with mere matters of form, or with the order in which a vendor carrier pays its losses, although the practical result is the same as that of another order of payment, which is not a violation of the second section, if the vendor carrier is not forbidden by the law to suffer honest losses as a dealer. Being unable, therefore, to find in the law anything which forbids a carrier to be a dealer in articles to be carried by it, and also being unable to find anything which forbids it as a dealer to suffer honest losses, I am unable to say that the transactions in question were in violation of the second section of the act.

No discussion of the sixth section of the act is necessary. If the transactions prior to 1903 did not violate the second section, they did not violate the sixth section.

We come now to a consideration of the third section of the act. This section forbids any common carrier subject to the provisions of the act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic, in any respect whatsoever, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic, to any undue or unreasonable prejudice or disadvantage in any respect whatsoever. It is quite clear that this language is so broad that, by merely becoming a vendor of the articles carried, the carrier does not escape

the inhibitions of the third section. If any undue advantage is given any one, or any undue prejudice is caused any one, by the transactions of a carrier involving carriage, this statute forbids such transactions. This section is not confined to advantage or prejudice caused by carriage at a rate less than the published rate.

We are now, therefore, brought to consider if the transactions in question, prior to 1903, either gave some one an undue advantage, or caused some one an undue prejudice, in any respect whatsoever. From the cross-examination of Mr. Hotchkiss, it appears that coal "destined beyond the Capes" means coal going to New York or to New England. In the sixth clause of the agreed facts is an admission which seems to be capable of no fair construction, other than that some coal from the West Virginia mines went in cargo lots during the period in question to New York or New England consumers other than the New Haven Company. It is possible that such consumers in fact paid no more for the coal than the New Haven Company was paying; but, if so, either some coal operator or some coal dealer or some water carrier suffered a comparative loss. For on all the coal going to other consumers the full published tariff rate of the C. & O. was charged and collected. If the consumers of the coal, other than that going to the New Haven Company, paid as much to the coal producers as the C. & O. paid, and paid as much to the water carriers as the C. & O. paid, and paid full freight rates to the C. & O., it is evident that such consumers had to pay more for their coal than the New Haven Company was paying. If, on the other hand, such consumers paid no more for their coal than the New Haven Company, then either some coal producer received less than did the producers of the coal going to the New Haven Company, or some water carrier received less, or some coal dealer suffered the loss. I cannot, from the evidence, say just who suffered this comparative prejudice, but it is sufficient if any one did. The third section is very comprehensive and broad. A prejudice to any one or to any particular description of traffic in any respect is forbidden. It is also to be noted that this section is in the disjunctive. It is not necessary to the application of the statute that there be both an advantage to the carrier's vendee and a prejudice to some one else. If either result is caused by the transaction in question, the statute applies. It may be said that, so far as the evidence shows, this other coal may have been sold by the C. & O., and at the same low price as that received from the New Haven Company. But if this be true, the fact was peculiarly within the knowledge of the C. & O., and should have been proved by it. It may further be said that the prejudice here may have been suffered only by some New York or New England consumers, and that there is no evidence that such consumers were competitors of the New Haven Company. But I find no such limitation in the third section. Prejudice to any one is forbidden. Moreover, the question of the intent of the parties is not involved. It is generally true, especially as to common-law offenses, that there must be both the act and the criminal intent in order to constitute a crime. But where a statute forbids an act to be done, the offense is committed by doing the act, regardless of the intent.

So, also, want of knowledge by the purchaser that the carrier's contract is or has become illegal is immaterial. The letter of the law and the policy of the law, for the public good, demand that such a contract shall not be performed. I have never heard that the courts can refuse to enforce a law because a party to a contract made in violation of law is ignorant that the law is being violated. It is also to be observed that this section applies as much to an unexpected advantage or prejudice not contemplated by either party at the inception of the contract as it does to an advantage given or prejudice caused with clear intent to violate the statute. Of course, some very slight advantage or prejudice is not forbidden. It must be "undue" or "unreasonable." I am fully convinced that if a carrier vendor makes a contract such as we have here under consideration, at a time when the contract price will pay, or will practically pay, all cost items and the published freight rate of the carrier, such contract does not become illegal, if, for reasons beyond the carrier's control, the cost items rise somewhat—if not too much—above the prices prevailing when the contract was made. But the very gist of the case lies in the amount of this increase in the cost items. The standard by which to determine when an advantage to one or a prejudice to some other is undue or unreasonable is not difficult to determine. Whenever it is sufficient in amount to be substantial and of importance to either the one receiving the advantage, or to the one suffering the prejudice, it must be held to be undue or unreasonable. In the case at bar, we should properly consider that the difference between the price received by the C. & O. and the aggregate of cost items and its published freight rates is to be treated as a loss suffered as dealer, but by one required to collect its full freight rates. Upon making the calculation, we find that the loss was $301,959.13 on the actual deliveries made prior to 1903, and that there was a further loss of at least $130,000 because of failure to make deliveries during the period in question. The total loss being $431,959.13, there was an average loss of over 23 cents per ton on the actual deliveries. I cannot escape the conclusion that this advantage to the New Haven Company, or prejudice to some or all of those concerned with the other coal that went to New York or New England from the West Virginia mines, is sufficient in amount to be substantial and of importance.

While a carrier may become a dealer in articles of transport, and can sell, and consequently can contract to sell, such articles at a price which pays, or practically pays, the cost items and its own published freight charges, yet whenever the cost items so substantially rise that the loss to the carrier as a dealer, and the subsequent advantage to the purchaser consignee, or the disadvantage to some one else, becomes unreasonable or undue, such sales become, or such contract becomes, illegal. When such a state of fact comes to exist, the carrier must plead the illegality of the transaction, and cease to perform. It is not an answer to the foregoing to say that the losses of a carrier dealer may be treated as losses on its account as a dealer. If there is a loss, no matter to which of the carrier's accounts it is charged, there is, under evidence such as we have here, either an advantage to the purchaser, or a disadvantage to some one else, equal to this loss. If we

give an ordinary and reasonable meaning to the language of the third section of the act, every conceivable case of preference or advantage given by a carrier to one person, or of prejudice caused to be suffered by some one else, is forbidden.

The conclusion I have reached gives a carrier a right to cease to perform contracts made in good faith whenever the cost of the article or the other cost items go to such a point that the contract price does not equal, or practically equal, the cost items and the carrier's published freight rates. This may occasionally result in great hardship to the carrier's vendee. But the books abound in closely analogous cases, where shippers who obtained by honest mistake on the part of railroad agents an agreement for carriage at less than schedule rates have been held without remedy when the carrier refused to abide by the contract and insisted on the full tariff rate. Chicago R. Co. v. Hubbell (Kan.) 38 Pac. 266; Bundick v. Savannah R. Co. (Ga.) 21 S. E. 995; Missouri R. Co. v. Bowles (Ind. T.) 40 S. W. 899; Houston R. Co. v. Dumas (Tex. Civ. App.) 43 S. W. 609; San Antonio R. Co. v. Clements (Tex. Civ. App.) 49 S. W. 913; Missouri R. Co. v. Stoner (Tex. Civ. App.) 23 S. W. 1020; Gulf R. Co. v. Hefley, 158 U. S. 99, 15 Sup. Ct. 802, 39 L. Ed. 910; Southern R. Co. v. Harrison (Ala.) 24 So. 553, 43 L. R. A. 385, 72 Am. St. Rep. 936; Southern R. Co. v. Wilcox, 99 Va. 394, 39 S. E. 144; Bullard v. N. P. R. Co. (Mont.) 25 Pac. 120, 11 L. R. A. 246. The interests of the many in having carriers required to observe the provisions of the interstate commerce act far outweigh the interests of the few who make contracts with carriers which cannot be performed except by violating the act.

Having reached the conclusion that there was here an undue preference or an undue prejudice, it follows that the demand made by the New Haven Company in April, 1903, for $103,000 damages for breach of the contract of 1896, was a demand for damages for a failure to perform an illegal contract. The law does not allow damages for a failure or refusal to do an act which the law forbids to be done. The demand of the New Haven Road was therefore an illegal and unenforceable demand.

I do not discuss some very interesting questions that might arise under the construction I have given the third section of the commerce act. Could a vendor carrier voluntarily legalize, or be compelled to legalize, performance of a contract of sale and carriage which has become illegal by reason of an advance in cost items, by reducing, or being required to reduce, its published freight rates? As the C. & O. has not offered to do this, and as the New Haven Company has not asked cross-relief, this question is not presented in the case. Again, could a carrier vendor render illegal the performance of a contract, which otherwise it could legally perform, by increasing its published freight rate on the article contracted to be carried and sold by it? This question, also, is not here involved. While reasons occur to me leading to the belief that performance of such contract could neither be legalized nor rendered illegal by the methods suggested, a discussion of these questions would be purely by the way, and would unnecessarily add to an opinion which is already of too great length.

In regard to the transactions of 1903 it is unnecessary, so far as we

are concerned merely with the commerce act, to determine whether the C. & O. was the vendor of the coal, or merely the carrier. If it was the vendor, its acts were illegal, for the reasons given above, as it appears that the published rate of $1.45 was in 1903 collected on other Kanawha coal; and, if it is to be considered merely as a carrier, its acts were also illegal, for it was carrying the coal at less than its published tariff, and its excuse that in so doing it was merely paying a debt due its creditor the New Haven Company cannot avail. This demand is an illegal and unenforceable claim. Under such facts the case of Union Pacific v. Goodridge, supra, governs us. However, in view of a possible construction of the third clause of the Elkins act (Act Feb. 19, 1903, c. 708, 32 Stat. 848 [U. S. Comp. St. Supp. 1903, p. 365]), it is necessary to determine whether the C. & O. was the vendor of the coal to be delivered under the verbal agreement of April, 1903, or was merely the carrier thereof. If the C. & O. was merely the carrier, and hence was carrying at less than its published rates, it is contended that the Elkins act requires that an omnibus injunction be issued, requiring that the C. & O. observe its published tariffs in respect to all carriage for all persons. If, on the other hand, a mere case of undue advantage or disadvantage, created otherwise than by a rebate on rates, is made out, it is admitted that a mere injunction against the continuance of the particular transaction proved is all that should be awarded. I have therefore carefully considered the record, to learn, if possible, the true nature of the verbal agreement of April, 1903. The answers of both the defendants, the testimony of Mr. Stevens before the commission, and the affidavit of Mr. Hall, show, I think, that the C. & O. was in fact the vendor of the coal to be delivered under the verbal agreement. The affidavit of J. R. Thomas might lead to some doubt on this point, except for the explanation of his statement found in the papers above referred to. The C. & O. employed certain agents in the transaction, but in fact and in legal contemplation it was the vendor of the coal. It was simply continuing the performance of the incomplete contract of 1896, delivering Kanawha coal at the former contract price. And the advantage to the New Haven Company, or the prejudice to some one or all the persons concerned with other Kanawha coal, was in 1903 very great, because the C. & O. was receiving for the coal delivered in 1903 more than a dollar per ton less than the aggregate of the cost items and its published freight rate; the loss being over $40,000 on the 38,078 tons delivered in 1903. See Tables 1 and 2, ante. And it is of no avail to ask that we treat this loss as a payment of an indebtedness theretofore incurred. This indebtedness, not being a valid and enforceable claim, cannot be treated as if it were such.

From what has been said, it follows that it is not necessary to construe the Elkins act as applicable to a case of carriage at less than published rates. The case at bar is merely one of discrimination brought about by transactions that cannot, as I think, be properly treated as a violation of the second section of the commerce act, but which must be treated as a violation of the third section of that act. The order should therefore merely enjoin the further performance of the agreement between the defendants.