UNITED STATES v. MILWAUKEE REFRIGERATOR TRANSIT CO. et al.

(Circuit Court, E. D. Wisconsin.   December 28, 1905.)

1. CARRIERS—SUIT FOR VIOLATION OF INTERSTATE COMMERCE LAW—SUFFICIENCY OF BILL.

In a suit in equity by the United States against interstate carriers and others, brought, under Elkins Act Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1905, p. 599], to enjoin the giving and receiving of unlawful rebates, in which the lawfulness of payments made by the carriers depends upon the intent with which they were made and received, the bill is sufficient on its face to show the unlawful intent and the illegality of the payments, where it alleges that a defendant brewing company, which was a large shipper of beer prior to the enactment of such statute, habitually received rebates from carriers; that shortly after such enactment its officers, who were also its controlling stockholders, organized a transit company (defendant) and became its officers and the owners of practically all of its stock, and on behalf of the brewing company contracted with it to make all the shipments for the brewing company; that the transit company contracted for shipments with such interstate carriers as would pay it from one-tenth to one-eighth of the published rate

for the transportation, ostensibly as a commission for obtaining the business, but in fact, as was well known to the carrier defendants, as a rebate for the benefit of the brewing company.

2. SAME.

It is the manifest purpose of the statutes regulating interstate commerce to strike through all pretense and all ingenious devices to the substance of the transaction, and it is the duty of the courts to recognize and carry into effect such purpose in suits for their enforcement.

3. CORPORATIONS—IDENTITY—DOCTRINE OF SEPARATE LEGAL ENTITY.

A corporation will be looked upon as a legal entity, as a general rule, and until sufficient reason to the contrary appears; but, when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons; and, where one corporation was organized and is owned by the officers and stockholders of another, making their interests identical, they may be treated as identical when the interests of justice require it.

4. EVIDENCE—INTENT—FACTS SHOWING SYSTEM.

In case of an equivocal act which is unlawful if so intended, but not otherwise, or which is claimed to have been accidental or through mistake, evidence of unconnected but similar facts is always admissible to show intent or system or rebut accident; and, under such rule, upon an issue as to whether a corporation organized and owned by the officers and stockholders of another is in fact an independent corporation or was organized merely as a dummy to enable the other through it to solicit and obtain illegal rebates from carriers, the fact that the latter had previously and habitually received rebates in violation of law is pertinent and may be alleged and proved.

In Equity. On motion to strike out, and on general demurrers to the bill by the Chicago, Rock Island & Pacific Railway Company and others.

H. K. Butterfield, U. S. Atty., and Charles Quarles, for the United States.

Winston, Payne & Strawn, for defendants.

SANBORN, District Judge. This is a bill in equity for an injunction to prevent the payment of alleged rebates on freight, brought under Elkins Act Feb. 19, 1903, c. 708, 32 Stat. 847 [U. S. Comp. St. Supp. 1905, p. 599]. The defense outlined in argument of the demurrers is that it appears on the face of the bill that the alleged rebates were not paid back to the shipper (the brewing company), but to the Refrigerator Transit Company, and, in substance and effect, nothing more is shown than the payment to a soliciting agent (the transit company) of a commission of an eighth or tenth of the published tariff rates, thus showing, in real effect, acts neither unlawful, immoral, nor injurious. A motion is also made on behalf of the brewing company to strike out certain allegations averring prior and disconnected illegal acts on its part, said to be material in proof, to characterize the acts of its principal officers and managers in organizing the transit company, and rebut the theory that the moneys paid by the carriers to the transit company were paid as commissions for obtaining the business and not as prohibited rebates.

The provisions of section 10 of the interstate commerce act, the act of 1889 (Act March 2, 1889, 25 Stat. 857 [U. S. Comp. St. 1901, p. 3160]), and the Elkins act, may be thus summarized:

## Section 10, Interstate Commerce Act.

Common carriers, and the officers of such as are corporations, receivers, agents, etc., of such corporations, are prohibited from giving rebates, preferences, and advantages, and making unjust discriminations, and are punishable by fine and imprisonment. Under this section only the agents of corporate carriers, and not the carriers themselves, were punishable. U. S. v. Mich. Cent. R. Co. (D. C.) 43 Fed. 26.

## Act of 1889.

Agents of carriers: Any common carrier, and officers and agents of corporation carriers, who by means of false billing, classification, weighing, or other device or means, shall assist, suffer, or permit any one to obtain transportation at less than established rates, shall be guilty of a misdemeanor, punishable by fine and imprisonment.

Shippers: Any person or corporation agent shipping property, who shall knowingly, by false billing, classification, etc., or other device or means, with or without the carrier's consent or connivance, obtain carriage at less than such established rates, shall be deemed guilty of fraud, declared to be a misdemeanor, punishable by fine and imprisonment.

Bribery to obtain unjust discrimination: Any such person, officer, etc., who shall by paying money or thing of value, or by solicitation, induce a carrier to discriminate unjustly in his favor as against other shippers, or aid or abet such discrimination, he shall be deemed guilty of a misdemeanor, punishable by fine and imprisonment.

Tort action: Shippers discriminated against are given action for damages against such person, officer, etc., as well as the carrier.

Corporation carriers themselves, it will be noticed, are not within the penalties of these acts; and the defense that the supposed discrimination was made not under like circumstances and conditions was always available.

## Elkins Act of 1903.

Corporation carriers are made liable to the same extent as were their agents under the earlier statutes, but subject to fine only, not imprisonment. Their willful failure to publish tariffs or rates, or strictly observe them, is a disdemeanor punishable by fine. It is made unlawful and punishable for any person or corporation to offer, grant, or give, or to solicit, accept, or receive, or offer so to do, any rebate, concession, or discrimination in respect of transportation in interstate or foreign commerce by common carriers within the former statutes, whereby any such property shall, by any device whatever, be carried at less than the published tariff rate. Offenses under the earlier acts, followed by convictions after this act, are punishable only by fine. The acts or omissions of agents are deemed the acts or omissions of the carrier also. The published rate is made conclusive, and any departure therefrom punishable. Suits in equity by the commission, as well as those directed by the Attorney General, are authorized, and the provisions of the expedition act and anti-trust act are made applicable. It will be observed that this act makes the corporation car-

riers themselves liable, eliminates the question of like circumstances and conditions by making the published rate conclusive, and abolishes punishment by imprisonment.

In effect the bill in this case is claimed to charge the creation by a shipper of a dummy corporation as a device to cover rebates on large shipments of beer in interstate and foreign traffic. The carriers which are charged with paying the rebates are joined as defendants, and some of them have filed general demurrers for want of equity in the bill. The Pabst Brewing Company has also moved to strike out the following paragraph:

"That until the passage and promulgation of the act of Congress entitled 'An act to further regulate commerce with foreign nations and among the states,' approved February 19, 1903, said defendant Pabst Brewing Company had, through the agency of said Gustav G. Pabst and Frederick Pabst, habitually received from many of the railroads and common carriers, which so transported the beer and other articles so shipped by it from the state of Wisconsin into foreign countries and states other than Wisconsin, rebates and concessions and other discriminations."

The bill, after stating that the Pabst Brewing Company, Milwaukee Refrigerator Transit Company, and Wisconsin Central Railway Company are Wisconsin corporations, and the other defendants foreign corporations, that the Attorney General has directed these proceedings, that the shipments originate in Milwaukee and continue in other states and countries, contains the following allegations, here given in brief outline (the figures refer to the numbered paragraphs of the bill):

(11) The transit company was, on October 7, 1903, organized, inter alia, to operate refrigerator cars on defendants' and other lines. It owns or controls 540 such cars. It was conceived, and is operated, as defendants carriers well knew, as a device to cover the receiving of rebates, concessions, and discriminations, to wit, an eighth or tenth of the published rate; whereby the traffic is carried at less than published rates. Such rebates are paid and accepted under the pretense, claim, and guise of "commissions," and amount to large sums to complainants unknown.

(12) The transit company was incorporated by procurement of the attorneys of the brewing company, and at its instance and request, with a capital of $150,000, having five directors, and with power to acquire and operate refrigerator cars, and contract for the supply and operation of refrigerator transportation by land and water.

(13) The Brewing company is a Wisconsin Corporation operating a large brewery, and selling and shipping beer into all the states and territories and to purchasers in foreign countries. It has a capital of $10,000,000 or 10,000 shares. Gustav Pabst and Fred Pabst are brothers, owning 2,000 shares, and with their mother and sisters over half of the stock. They vote and control a majority of the stock, and have always directed and controlled the election of directors, and their action; they have been and are its president, vice president, and general managers, and have always controlled all its sales, purchases, and shipments.

(14) (Here occurs the passage above quoted as to rebates prior

to the Elkins act.) Upon the passage of that act the brewing company was no longer able to directly secure rebates, and cast about for some device to evade the statute, and the Pabsts, as such officers, and one Howe, as traffic manager, intending to contrive and operate a device for such evasion, caused the transit company to. be formed. Of its 1,500 shares, 1,340 were issued to the two Pabsts, 35 shares to Fred Pabst's wife, and the balance to dummy directors, to give color to the claim that its stock was not owned by the brewing company. After investigation by the interstate commerce commission in May, 1905, Gustav Pabst transferred his stock in the transit company to Fred Pabst, and had some person elected director in his place; but such acts were colorable merely, he still retaining a large pecuniary interest in the corporation, and participating in its control.

(15) Immediately on the creation of the transit company the Pabsts, as controlling officers of the brewing company, contracted with themselves as executive officers of the transit company, for a term not yet expired, to give the latter exclusive control of the shipment of all freight of the brewing company moving in interstate and foreign commerce, which it is still exercising. The contract was made to enable the transit company to route the shipment of such freight on the lines of such companies as will pay rebates, and withhold it from such as will not; and all the rebates, concessions, and discriminations charged in the bill have been exacted by threats of such diversion. Many thousand tons of said freight have been hauled by defendant carriers since the contract was made. On such shipments the brewing company pays to the carriers the full tariff rate, and the carriers pay the transit company for use of its refrigerator cars for mileage three-fourths of a cent to a cent per mile, and in addition an eighth or tenth of the sums paid them by the brewing company; and in every instance the property is transported by defendant carriers at an eighth or tenth less than the published tariff. Such rebates amount to many thousands of dollars, the exact sum unknown to complainants.

(16) All the defendant carriers well knew that the transit company was organized in the interest of the brewing company, and for the purpose of evading the law, and paid such rebates with the like purpose and intent.

(18) The transit company claims and pretends that such repayments were made and accepted as compensation for its services in soliciting and procuring freight for carriage by defendants; but such claim or pretense is untrue. The transit company has entire control of all the shipping business of the brewery, comprising almost the entire business of the transit company, which it does not solicit; the only possible consideration moving from it to the carrier being its refraining to divert the business. All such repayments have always been known to all said parties to be a device for unlawful rebate, concession, and discrimination. But such payments constitute unlawful concession and discrimination, whether or not the transit company solicits the shipments, which, if not so solicited and procured, would be diverted from the carrier so paying.

Such are the charges of the bill challenged by the demurrers. Two questions are presented: Whether the payments are sufficiently shown to have been made, "by any device whatever," not as com-

missions, but with intent to evade the law; and whether the two Wisconsin corporations are so united in interest, control, and management as to make them substantially the same.

Many devices and schemes have been contrived to evade the statutes against discrimination. The reports of the commission abound with them. One of the most common is the manipulation of carriers controlled by the shipper, like those shown in the Salt Cases, 10 Interst. Com. Com'n R. 1, and Id. 148; and in the Chicago Terminal Case,. 10 Interst. Com. Com'n R. 385, where it was claimed that a terminal company controlled by a large shipper was given an excessive share of a joint rate. Another device is the direct purchase of freight by a carrier, and its sale and carriage at a loss, as in Interstate C. C. v. Chesapeake & O.R. Co. (C. C.) 128 Fed. 59; or by its indirect purchase through a dummy corporation, and shipment at nominal freight rates by the carrier itself, as in Re Alleged Unlawful Rates in the Transportation of Grain, 7 Interst. Com. Com'n R. 33. In these cases the rule is laid down that, if such dealings are devices .for discrimination, they are unlawful, although in ordinary cases it is not unlawful for the carrier to be also the shipper. And in Interstate Commerce Com'n v. Baird, 194 U. S. 25, 43, 24 Sup. Ct. 563, 48 L. Ed. 860, contracts for the purchase of coal were held admissible, where their real purpose was claimed to be the fixing of rates.

## The Question of Intent.

Here is an act of doubtful or equivocal import, asserted on the one hand to be innocent and lawful, and on the other to be a mere device or subterfuge to evade the law. Are the payments lawful commissions or unlawful rebates? The question can only be answered by finding out with what intent the acts were done. Some acts are made criminal without respect to their intent, like counterfeiting; but in most cases intent is material. The payments in question were innocent and lawful if in good faith intended as commissions, but criminal if intended as rebates. The intent becomes therefore not merely material, but absolutely vital. The bill states several facts tending to show unlawful purpose: Such as prior habitual violations of former laws, not then sufficiently punishable, and later the creation of a dummy corporation to escape from the strictness of an amended statute; which corporation, though a separate legal entity, should be substantially the some aggregation of persons, interests, and aims; scienter of the carriers of the purposes of such manipulation; that the transit company solicits no freight, etc. As said by the commission in the Chicago Joint Rate Case, 10 Interst. Com. Com'n R. 385, the manifest purpose of these statutes is to strike through all pretense, all ingenious device, to the substance of the transaction itself. The allegations seem to me sufficient to call for plea or answer, so far as the question now under consideration is concerned.

## The Question of Corporate Identity or Control.

It is further essential, to bring the case within the law, that the repayments be made to the brewing company, or for its benefit, directly

or indirectly, and not merely to third persons for obtaining the business; otherwise the repayment is no more than a salary or other expense incident to the carrier's business. The remaining question, then, is whether this is sufficiently shown in the bill. It is forcibly argued that the bill carefully avoids the statement that the brewing company received the money repaid, or even that it was paid back for its benefit; and that the two corporations are not only distinct legal entities, but have different stockholders. The bill shows the creation, by the controlling interests of the brewing company, of a dummy corporation, with dummy directors, and scienter of its character by the carriers, with intent to evade the law. It is argued that these averments show that the transit company is merely the alter ego of the brewing corporation; both being substantially identical in interest and control, and the brewing company the ultimate beneficiary, in some form, of the operations in question. Now is not this the usual device of a shipper securing discrimination by manipulation of carriers in which it is interested?

That the transit company is controlled by the managing agents of the brewing company is entirely clear. But is it controlled by the shipper corporation? The solution of this question depends on whether the brewing corporation, in a case like this, is an association of individuals, rather than a legal entity apart from those who own and control it. No doubt the general rule that a corporation is a legal entity, an institution, artificial, intangible, existing only by legal contemplation, and separate and apart from its constituents, is firmly imbedded in the common law of this country. It has been so laid down in hundreds of cases. In the Dartmouth College Case Chief Justice Marshall adopted and expressed it, almost in the exact language of Lord Coke, in Coke on Littleton, 27b; and this definition has been universally approved, especially in cases involving the extent of the corporate powers.

It is, however, most significant that the Supreme Court of the United States was the first to break away from the notion that a corporation is only a legal entity, when its literal application would operate with injustice. If a corporation is only a legal entity, of course, it cannot be a citizen of a state. Hence the Supreme Court, in order to sustain the most important and far-reaching jurisdiction of the national courts over corporations, depending on the citizenship of the parties, was obliged to adopt some other theory of corporate constitution than that laid down by the great chief justice. This was accomplished by holding that a corporation is an association of persons who may have citizenship, and following this with the adoption of a fiction of law, supported by a conclusive presumption, by which the members of a corporation are conclusively presumed to be citizens of the state creating it. Hope Ins. Co. v. Boardman, 5 Cranch, 57, 3 L. Ed. 36; Louisville, etc., R. Co. v. Letson, 2 How. 497, 11 L. Ed. 353; Marshall v. R. Co., 16 How. 314, 14 L. Ed. 953. In reaching these results, the court, in answering the argument that a corporation is an artificial person, a mere legal entity, invisible and intangible, said that it was not reasonable that those who deal with corporate

affairs or agents should be deprived of the valuable privilege of liti-, gating in the federal courts by a syllogism, or rather sophism, which deals subtly with words and names, without regard to the things or persons they are used to represent. 16 How. 327, 14 L. Ed. 953. "For all purposes of acting, contracting, and judicial remedy," said Mr. Justice Grier, "they can speak, act, and plead only through their representatives or curators." Id. Thus the idea that a corporation is, for some purposes, an aggregation of individuals, and not a legal entity, was adopted, through a fiction of law, and given full effect. It was the same kind of fiction by which the English Court of Exchequer usurped jurisdiction by permitting an allegation that plaintiff was the King's debtor, and then allowing no one to deny it.

But, when the case of a consolidated corporation incorporated in two or more states, having the same stockholders, arose, the Supreme Court partially returned to the rule that a corporation is a legal entity, existing only in contemplation of law. And it was held that there are as many corporations as there are states in which the same group of persons is incorporated. In each of such states it is conclusively presumed that the shareholders are, for jurisdictional purposes, citizens of that state alone. Hence, a citizen of Illinois cannot in Illinois sue in a federal court the Chicago & Northwestern Railway Company, consolidated by incorporation in both Illinois and Wisconsin; but he may do so in Wisconsin. Railroad Co. v. Wheeler, 1 Black, 286, 17 L. Ed. 130; Railway Co. v. Whitton, 13 Wall. 270, 283, 20 L. Ed. 571. This result was reached by applying the rule that the legal entity existing by force of law can have no existence beyond the state or sovereignty which brings it into life and indues it with its faculties and powers. Id. "It is true that for certain purposes the law will recognize the corporation as an entity distinct from the individual stockholders; but that fiction is only resorted to for the purpose of working out the lawful objects of the corporation. It is never resorted to when it would work an injury to any one, or allow the corporation to perpetrate a fraud upon anybody." Held, that stock in one corporation directed by another corporation to be issued to the stockholders of the latter, and paid for by it, was in reality received by the corporation. The Sportsman Shot Co. v. American Shot & Lead Co. (Superior Court of Cincinnati) 30 Wkly. Law Bul. 87; State v. Standard Oil Co., 49 Ohio St. 137, 177, 30 N. E. 279, 15 L. R. A. 145, 34 Am. St. Rep. 541. "The abstract idea of a corporation, the legal entity, the impalpable and intangible creation of human thought, is itself a fiction, and has been appropriately described as a figure of speech. It serves very well to designate in our minds the collective action and agency of many individuals as permitted by the law; and the substantial inquiry always is what in a given case has been that collective action and agency?" People v. North River Sugar Refining Co., 121 N. Y. 582, 621, 24 N. E. 834, 9 L. R. A. 33, 18 Am. St. Rep. 843. "A corporation is an artificial person, created by law as the representative of those persons, natural or artificial, who contribute to and become the holders of shares in the property intrusted to it for a common purpose. * * * It is exclusively the

work of the law." In re Gibb's Estate, 157 Pa. 59, 27 Atl. 383, 22 L. R. A. 276, 281. "Corporations are but associations of individuals." Hightower v. Thornton, 8 Ga. 492, 52 Am. Dec. 412; 1 Kyd on Corp. 13. "Who, in law, constitute the company, if it be not the stockholders?" Gelpcke v. Blake, 19 Iowa, 268. "A private corporation is, in fact, but an association of individuals united for a lawful purpose and permitted to use a common name in their business, and to have a change of members in their business." Field, J., in Kansas Pacific v. Atchison Railroad, 112 U. S. 414, 5 Sup. Ct. 208, 28 L. Ed. 794. On the other hand, when dealing with the question of corporate power, the Supreme Court has gone so far as to hold that a contract ultra vires of the corporation, although assented to by all the stockholders, is void. Oregon Railway & Navigation Co. v. Oregonian Ry. Co., 130 U. S. 1, 9 Sup. Ct. 409, 32 L. Ed. 837.

A stockholder owning nearly all the stock cannot bind the corporation by a contract made in his individual capacity. Donoghue v. I. & L. M. Ry. Co., 87 Mich. 13, 49 N. W. 512; Finley Shoe & Leather Co. v. Kurtz, 34 Mich. 89; England v. Dearborn, 141 Mass. 590, 6 N. E. 837. It seems that an act of all the stockholders, as individuals, binds the corporation, as no one can object. Bundy v. Iron Co., 38 Ohio St. 300 (mortgage by all but one stockholder, to the remaining one, of corporate property, executed in the individual names of the stockholders, held valid). A corporation, from one point of view, may be considered an entity, without regard to its shareholders, yet the fact remains self-evident that it is not in reality a person or thing distinct from its consistent parts. The word corporation is but a collective name for the members who compose the association. Home Fire Ins. Co. v. Barber (Neb.) 93 N. W. 1024, 60 L. R. A. 927; City of Nashville v. Ward, 16 Lea, 27; People v. North River, etc., Co. (Sup.) 3 N. Y. Supp. 401, 2 L. R. A. 33; Ford v. Chicago Milk Shippers' Ass'n, 155 Ill. 166, 39 N. E. 651, 27 L. R. A. 298; First Nat. Bk. v. Trebein Co., 59 Ohio St. 316, 52 N. E. 834; Buffalo Loan, etc., Co. v. Medina Gas Co., etc., Co. (Sup.) 42 N. Y. Supp. 781. If any general rule can be laid down, in the present state of authority, it is that a corporation will be looked upon as a legal entity as a general rule, and until sufficient reason to the contrary appears; but, when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons. This much may be expressed without approving the theory that the legal entity is a fiction, or a mere mental creation; or that the idea of invisibility or intangibility is a sophism. A corporation, as expressive of legal rights and powers, is no more fictitious or intangible than a man's right to his own home or his own liberty.

Applying the rule here laid down to the circumstances shown to surround the brewing company and transit company, can it be doubted that there really is, in substance and effect, an identity of interest, or that the brewing company, considered as an association of individuals, really owns and fully controls the transit company? Or that the payment of the eighth or tenth of the rate is in reality, and in some form,

a payment to, or for the benefit of, the shipper? I think sufficient is alleged to show this. Moreover, it clearly appears that the shipper practically controls the transit company, and I think this shows a sufficient identity of interest among the shareholders of both in these repayments to make them rebates, if paid and received with unlawful intent. It is said that the procurement of the shipments through the contract is the mere soliciting of them for the carriers, for which they are lawfully authorized to pay a part of the rate, in order to get the business; and the transit company, owning a large number of refrigerator cars, and wishing to keep them employed, simply gives the freight to those competing shippers who will make the best terms, the business being of great volume, and the sums paid for freights large. But this theory of innocence is exploded by the fact, as alleged (whatever the actual proof may show), that the transit company is a mere separate name for the brewing company, being in fact the same collection of persons and interests. Assuming the truth of the averments, the device adopted is "neither new, nor deserving of new success." As the patent lawyers say of an aggregation, there is no new mode of operation, new use, or new result—simply the use of old things in a different situation.

There is no doubt some tendency in these days to accept general and vague charges of wrongdoing on the part of the corporations at a premium. Much has happened to arouse public feeling on this sensitive subject. For many years transportation development was encouraged in every possible way. The municipal aid craze was an early form of such stimulation. Praise for those who were seeking command of the trade of the world was unstinted and without dissent, and criticism forgotten. But now that we are beginning to feel the tyranny of arbitrary and overwhelming industrial and commercial power, the tendency is to go to the other extreme, and it becomes easy to excite prejudice leading to injustice. The courts will no doubt be somewhat influenced by such tendency; but so far as possible it is for them to keep fundamental rules steadily in view, and with discrimination and careful reflection see to it that injustice is prevented. Joseph Cooke once facetiously said that he had never traveled in Pennsylvania, but had often visited the domains of the Pennsylvania Railroad Company. These and other like domains are now subject to widespread attack; but it will not be forgotten that they are our domains, and, if they are being despoiled, the spoliation is the work of our trustees, who must indeed be brought to book, but the trust property at the same time preserved.

### The Motion to Strike Out.

It has been shown that the question of the intent of the brewing company, the transit company, and the carriers, is a material and vital issue in the case. It is asserted that the repayments are commissions only. On this issue it is certainly pertinent to show the facts alleged in the quoted paragraph. The leading American case on the admissibility of such evidence is People v. Molineux, 168 N. Y. 264, 61 N. E. 286, 62 L. R. A. 193. It can only be put in to prove knowledge,

motive, intent, or system, or rebut the theory of accident or mistake. Where the act is clearly unlawful with or without intent, such proof is excluded. But in case of an equivocal act, which is unlawful if so intended, though not otherwise, or claimed to have been accidental or through mistake, evidence of unconnected but similar facts is always admissible, to show intent or system or rebut accident. The following cases also illustrate the principle on which such proof is admitted: Bottomley v. U. S., 1 Story, 135, Fed. Cas. No. 1,688; Penn. M. L. Ins. Co. v. M. L. B. & T. Co., 19 C. C. A. 286, 72 Fed. 422, 38 L. R. A. 33. The rule is fully discussed and illustrated by Prof. Wigmore in his work on Evidence (sections 300–372).

The demurrers are overruled, and the motion to strike out denied.