**KANSAS GAS & ELECTRIC COMPANY,**
**Plaintiff and Appellant,**

v.

**Jeff ROSS, Defendant and Appellee,**
**and**

**Ross Service Company, Inc., a South**
**Dakota Corporation, Defendant.**

No. 18386.

Supreme Court of South Dakota.

Considered on Briefs Jan. 11, 1994.

Decided Aug. 24, 1994.

108

Leo J. Disburg of McCann, Martin & McCann, P.C., Brookings, for plaintiff and appellant.

Gary Pashby of Boyce, Murphy, McDowell & Greenfield, Sioux Falls, for defendant and appellee.

LOVRIEN, Circuit Judge.

This is an appeal by Kansas Gas & Electric Company (KG & E) from summary judgment granted to Jeff Ross in an action by KG & E to "pierce the corporate veil" of Ross Service Company, Inc. (Ross Service) and hold Jeff Ross individually liable for outstanding corporate debt. We affirm.

## FACTS

Ross Service is a South Dakota corporation engaged in the scrap metal and wire salvaging business. KG & E is a Kansas corporation engaged in the supply of natural gas and electric power.

This controversy arose from a transaction initiated on June 27, 1990, when Ross Service submitted a bid of 38 cents per pound to KG & E for the purchase of approximately 1.9 million pounds of surplus wire. Ross Service was to provide trucking and pay KG & E weekly for wire received.

The bid was signed "Jeff Ross, Owner, Ross Service Company, Inc." KG & E accepted this bid on July 2, 1990. Pursuant to the agreement, KG & E, according to their records, provided Ross Service with surplus wire worth $706,977.72 from July to October of 1990. Ross Service failed to keep up with its weekly payments. Of the $706,977.72 owed under the contract, Ross Service did not pay $194,204.40. It claimed, among other things, that it had not received all the wire that KG & E's records indicated.

As a result of Ross Service's failure to pay the amount owed, KG & E sued Ross Service and Jeff Ross.[1] KG & E later settled its dispute with Ross Service, but sought to recover from Jeff Ross individually by piercing the corporate veil.[2]

Ross Service was incorporated in March of 1979 by John and Edith Ross. John Ross is president and Edith Ross is vice president and secretary of the corporation. They are

---

1. KG & E's original complaint dated April 10, 1991, names Jeff Ross and Ross Service Company, Inc. as defendants. KG & E then filed an amended complaint on March 19, 1992, naming Jeff Ross's parents, John Ross and Edith Ross as additional defendants and seeking to have these three persons held individually liable. However, KG & E reached a settlement with John and Edith Ross and Ross Service Company, Inc. prior to the hearing on the summary judgment motion and these defendants were duly dismissed from the suit.

2. As to Jeff Ross, the only theory of liability plead by KG & E in its amended complaint was that the corporate veil should be pierced, making Jeff Ross, among others, personally liable for all corporate obligations. While other theories of liability might exist, they were not pled, were not argued before the circuit court and are not before us on appeal.

the parents of Jeff Ross. It is undisputed that Jeff Ross was employed by the corporation from 1979 to July of 1991. Rodney Ross, Jeff's brother, was the treasurer of the corporation until his death in 1984.

At the time of incorporation, an initial subscription of 640 shares of stock was issued by John Ross. He then kept 319 shares for himself, gave 319 shares to Edith Ross and the remaining two shares to Rodney Ross.

Although Jeff Ross never received any of the original subscription shares, there is a dispute of fact regarding Jeff Ross's status as a shareholder. Edith Ross testified that after Rodney's death in 1984, his two shares were given to Jeff Ross. This testimony is the only evidence that Jeff Ross was ever a shareholder in Ross Service. Jeff Ross denies that he has ever been a shareholder in the company. Even when we view this factual issue in favor of KG & E and assume that the transfer was made to Jeff Ross, his ownership interest amounts to *only .3125%* of the outstanding stock.

The facts are also in dispute whether Jeff Ross served as an officer and/or director of Ross Service. The corporation's annual reports for 1989 and 1990 list Jeff Ross as a director for Ross Service. These reports were prepared entirely by Edith Ross. Jeff Ross denies that he was ever informed or consented to serving as a director of Ross Service. The annual report for 1991, which was filed on March 25, 1990, does not list Jeff Ross as a director even though he did not leave the employment of Ross Service until July of 1991.

Jeff Ross admits that two corporate notes bear his signature as treasurer of Ross Service. However, he claims to have no recollection of having signed these notes and states that he most likely did so at the direction of his parents or the bank.

The evidence also reveals that Ross Service's tax returns for 1989 and 1990 show all the officers who were compensated by the corporation and list only John and Edith Ross as officers of Ross Service. Jeff Ross is not listed as an officer.

In addition to his employment with Ross Service, Jeff Ross operated his own trucking company. The trucking company maintained a checking account at Norwest Bank in Dell Rapids, South Dakota. Ross Service maintained its corporate account with Dakota State Bank in Colman, South Dakota.

Ross Service experienced financial difficulties in the spring of 1990. As a result, Dakota State Bank began to apply all deposits made to the corporate account to existing loan balances Ross Service owed to the bank. To avoid this, Edith Ross asked Jeff Ross whether the corporation could use Jeff's trucking business account. Jeff agreed.

From April of 1990 to January of 1991, both Ross Service and Jeff Ross used the trucking company's account. Different size checks were used in an effort to distinguish Jeff Ross's personal expenses from Ross Services's corporate expenses.

In October of 1990, Ross Service issued two checks drawn on the trucking company's account in the amount of $7,500 for the purchase of a 1976 Ford truck and $2,200 for the purchase of a trailer. Jeff Ross kept the truck and trailer for his own personal use. The record shows that he reimbursed the account for these items by depositing $10,000 into the trucking company account in October of 1990 from a loan he received from Norwest Bank. The record also shows that the truck and trailer were listed on the loan documents as the items being purchased and as the items in which a security interest was being granted to Norwest Bank.

At the close of discovery, Jeff Ross moved for summary judgment. A hearing was held by the trial court on December 21, 1992, where the motion was granted.[3] The court

---

**3.** In doing so, the trial court found (1) that Ross Service was incorporated at the time the contract was entered into; (2) that although certain corporate formalities were not addressed, it was clear that all parties were aware that the contract was being entered into between corporations; (3) that Ross Service was operated as a separate corporation; (4) that corporate tax returns and annual reports were filed; and (5) that the corporation borrowed money in its own name and contracted business as a separate corporation. The trial court also found that if Jeff Ross was in fact a shareholder, he was a very

concluded that even though Jeff Ross may have had some control over the corporation as a manager, he was such a minor shareholder that the court could not say that he was operating the business as his alter ego. KG & E appeals the judgment.

The only issue raised on appeal is whether the trial court erred in granting summary judgment to Jeff Ross. KG & E argues that summary judgment is improper because there are genuine issues of material fact to be determined in this case.

### DECISION

### I. *SUMMARY JUDGMENT STANDARD*

Our standard of review for a grant or denial of summary judgment is well settled:

> In reviewing a grant or a denial of summary judgment under SDCL 15-6-56(c), we must determine whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law. The evidence must be viewed most favorably to the nonmoving party and reasonable doubts should be resolved against the moving party. The nonmoving party, however, must present specific facts showing that a genuine, material issue for trial exists. Our task on appeal is to determine only whether a genuine issue of material fact exists and whether the law was correctly applied. If there exists any basis which supports the ruling of the trial court, affirmance of a summary judgment is proper.

*Ashby v. Northwestern Public Service Co.*, 490 N.W.2d 286, 288 (S.D.1992); *Waddell v. Dewey County Bank,* 471 N.W.2d 591, 593

(S.D.1991); *Garrett v. Bankwest, Inc.*, 459 N.W.2d 833, 836-37 (S.D.1990); *Pickering v. Pickering,* 434 N.W.2d 758, 760-61 (S.D. 1989). With this standard in mind, we have carefully reviewed the record and find that no genuine issue of material fact exists. The trial court properly granted Jeff Ross's motion for summary judgment.

### II. *PIERCING THE CORPORATE VEIL*

█ A firmly entrenched doctrine of American law is the concept that a corporation is considered a legal entity separate and distinct from its officers, directors and shareholders[4] until there is *sufficient reason* to the contrary. 1 Charles R.P. Keating & Gail O'Gradney, *Fletcher Cyclopedia of the Law of Private Corporations* § 25 (perm. ed. 1990); 18 Am.Jur.2d *Corporations* § 43 (1985); 18 C.J.S. *Corporations* § 8 (1990).

We have long recognized this doctrine as well. *See Mobridge Community Industries v. Toure,* 273 N.W.2d 128, 132 (S.D.1978); *Farmers Feed & Seed v. Magnum Enterprises,* 344 N.W.2d 699, 702 (S.D.1984); *Ethan Dairy Products v. Austin,* 448 N.W.2d 226, 230 (S.D.1989); *Baatz v. Arrow Bar,* 452 N.W.2d 138, 141 (S.D.1990).

This concept of "limited liability" is considered the central purpose for choosing the corporate form because it permits corporate shareholders to limit their personal liability to the extent of their investment.[5] *Ross v. Playle,* 505 N.W.2d 515, 517 (Iowa App.1993); and *see Keating & O'Gradney, supra,* at § 14; *Anderson v. Abbott,* 321 U.S. 349, 362, 64 S.Ct. 531, 537-38, 88 L.Ed. 793 (1944) ("Limited liability is the rule not the exception; and on that assumption large undertakings are rested, vast enterprises are

---

minor one, and any evidence tending to show that he was a shareholder was extremely weak.

4. As early as 1819, in *The Trustees of Dartmouth College v. Woodward,* Chief Justice Marshall wrote that "[a] corporation is an artificial being, invisible, intangible, and existing only in contemplation of law." 17 U.S. (4 Wheat.) 518, 636, 4 L.Ed. 629, 635 (1819); and *see Aimonetto v. Rapid Gas, Inc.,* 80 S.D. 453, 458, 126 N.W.2d 116, 119 (1964) ("A corporation is an artificial legal creation, invisible, and intangible, and can act only through its officers and agents.")

5. In *Bass v. Happy Rest, Inc.,* 507 N.W.2d 317 (S.D.1993) we noted:

> Incorporation for the purpose of achieving limited liability is one of the principal objectives of incorporation. Limited liability is enjoyed even by a controlling shareholder. Under corporate contracts, ordinarily the corporation, and not the shareholders, suffers the liabilities. Shareholders, directors and officers who cause their corporation to breach its contract with a third party are usually not liable for inducing breach of contract.

*Id.* at 319 n. 4 (quoting Henn and Alexander, *Corporations* § 146 at 344 (3rd ed. 1983)).

launched, and huge sums of capital attracted.")

■ The principal exception to the limited liability rule is the doctrine of "piercing the corporate veil." This doctrine is equitable in nature and is used by the courts to disregard the distinction between a corporation and its shareholders to prevent fraud or injustice. *See Keating & O'Gradney, supra,* § 41.25 at 652; 18 C.J.S. *Corporations* § 10 at 277–78. The general rule which has emerged is that a corporation will be looked upon as a legal entity separate and distinct from its shareholders, officers and directors unless and until sufficient reason to the contrary appears, but when the notion of a legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, then sufficient reason will exist to pierce the corporate veil. *United States v. Milwaukee Refrigerator Transit Co.,* 142 F. 247, 255 (C.C.E.D.Wis.1905); *Baatz,* 452 N.W.2d at 141; *Global Credit Services v. AMISUB,* 244 Neb. 681, 508 N.W.2d 836, 842 (1993); and *see Keating & O'Gradney, supra,* § 41 at 603; 18 C.J.S. *Corporations* § 9.

"In deciding whether the corporate veil will be pierced, we recognize that 'each case is *sui generis* and must be decided in accordance with its own underlying facts.'" *Mobridge,* 273 N.W.2d at 132 (quoting *Brown Brothers Equipment Co. v. State,* 51 Mich. App. 448, 215 N.W.2d 591, 593 (1974)).

■ In our past decisions, we have discussed a number of factors[6] that might justify "piercing the corporate veil." After review of those decisions and the factors discussed therein, it is apparent that in making this determination, we have applied a two-part test:[7] (1) was there such unity of interest and ownership that the separate personalities of the corporation and its shareholders, officers or directors are indistinct or non-existent; and (2) would adherence to the fiction of separate corporate existence sanction fraud, promote injustice or inequitable consequences or lead to an evasion of legal obligations? *See N.L.R.B. v. Greater Kansas City Roofing,* 2 F.3d 1047, 1052 (10th Cir. 1993); *Chergosky v. Crosstown Bell, Inc.,* 454 N.W.2d 654, 658 (Minn.App.1990); *ALMAC, Inc. v. JRH Development, Inc.,* 391 N.W.2d 919, 922 (Minn.App.1986); *Keating & O'Gradney, supra,* § 41.30 at 662; David H. Barber, Note, *Piercing the Corporate Veil,* 17 Willamette L.Rev. 371, 376 (1981).

As to the first part of the test, the "separate corporate identity" prong, we note:

> The "separate corporate identity" prong is meant to determine whether the stockholder and the corporation have maintained separate identities. There are strong public policy reasons for upholding the corporate fiction. Where stockholders follow the technical rules that govern the corporate structure, they are entitled to rely on the protections of limited liability that the corporation affords. In determining whether the personalities and assets of the corporation and the stockholders have been blurred we consider (i) the degree to which the corporate legal formalities have been maintained, and (ii) the degree to which individual and corporate assets and affairs have been commingled.

*Greater Kansas City Roofing,* 2 F.3d at 1052.

■ Of the six specific factors which we have considered in the past, four are used in determining whether the first prong is met: (1) undercapitalization; (2) failure to observe

---

**6.** These factors include:

    (1) fraudulent misrepresentation by corporation directors;
    (2) undercapitalization;
    (3) failure to observe corporate formalities;
    (4) absence of corporate records;
    (5) payment by the corporation of individual obligations; and
    (6) use of the corporation to promote fraud, injustice or illegality.

*See e.g., Mobridge,* 273 N.W.2d at 132–33; *Curtis v. Vlotho,* 313 N.W.2d 469, 472 (S.D.1981); *Curtis v. Feurhelm,* 335 N.W.2d 575 (S.D.1983); *Farmers Feed & Seed,* 344 N.W.2d at 701; *Ethan Dairy Products,* 448 N.W.2d at 230; *Baatz,* 452 N.W.2d at 141; and *Bass v. Happy Rest, Inc.,* 507 N.W.2d at 319 n. 3.

**7.** A review of our precedent on the piercing doctrine shows that although we have not expressly adopted this two-part test in the past, we have consistently applied it in our decisions. *See generally, Mobridge,* 273 N.W.2d at 132–33; *Farmers Feed & Seed,* 344 N.W.2d at 701–02; *Ethan Dairy Products,* 448 N.W.2d at 230; and *Baatz,* 452 N.W.2d at 141.

corporate formalities; (3) absence of corporate records; and (4) payment by the corporation of individual obligations.[8] If these factors are present in sufficient number and/or degree, the first prong is met and the court will then consider the second prong.[9]

As to the second part of the test, the "fraud or inequitable consequences" prong, we note:

> Under the fraud, injustice, or evasion of obligations prong of the test we ask whether there is adequate justification to invoke the equitable power of the court. We require an element of unfairness, injustice, fraud, or other inequitable conduct as a prerequisite to piercing the corporate veil.
>
> *       *       *       *       *       *
>
> [T]he showing of inequity necessary to satisfy the second prong must flow from the misuse of the corporate form. The mere fact that a corporation ... breaches a contract ... does not mean that the individual shareholders of the corporation should personally be liable. To the contrary, the corporate form of doing business is typically selected precisely so that the individual shareholders will not be liable. It is only when the shareholders disregard the separateness of the corporate identity *and when that act of disregard causes the injustice or inequity or constitutes the fraud* that the corporate veil may be pierced.... In most cases the mere fact that a corporation is incapable of paying all of its debts is insufficient for a finding of injustice.... That condition will exist in virtually all cases in which there is an attempt to pierce the corporate veil.

*Greater Kansas City Roofing*, 2 F.3d at 1052–53 (citations omitted) (emphasis original).

■ The two factors which we have considered in the past to satisfy the second prong include: (1) fraudulent misrepresentation by corporation directors; and (2) use of the corporation to promote fraud, injustice, or illegalities.[10]

If both the "separate corporate identity" prong and the "fraud or inequitable consequence" prong of the test are met and "the court deems it appropriate to pierce the corporate veil, the corporation and its stockholders will be treated identically." *Baatz*, 452 N.W.2d at 141.

We will next apply this two-part test to the instant facts.

## III. APPLICATION OF THE TWO–PART TEST

■ Implicit in the first prong of the test is the idea that the person or persons whom the plaintiff wishes to hold individually liable must have exercised such *control* over the corporation that the notion of separate legal entity no longer exists. The corporation must have been used as the mere alter ego or instrumentality through which the defendant was conducting his or her personal business.

■ The control which is necessary to satisfy the first prong is that which is normally exercised by the shareholders, officers or directors of a corporation and must be distinguished from the type of control which may be exercised by a corporate manager or employee who merely acts as an agent of the corporation.

■ Thus, a threshold requirement for the first prong of the test is that the plaintiff must establish that the person which he or she seeks to hold individually liable was in fact a corporate shareholder, officer, director or similar corporate representative, such that

**8.** *See* note 6 *supra* and cases cited therein. Several other factors have also been considered by courts in determining whether the corporation and its shareholders have maintained separate identities. *See, e.g., Lakota Girl Scout Council, Inc. v. Havey Fund–Raising Management, Inc.*, 519 F.2d 634, 638 (8th Cir.1975); *Contractors, Laborers, Teamsters & Engin. v. Hroch*, 757 F.2d 184, 190 (8th Cir.1985); *Greater Kansas City Roofing*, 2 F.3d at 1052 n. 6; *Chergosky*, 454 N.W.2d at 657–58; *JRH Development, Inc.*, 391 N.W.2d at 922.

**9.** We have held that a court should pierce the corporate veil only upon the strongest evidence of these factors. *Ethan Dairy Products*, 448 N.W.2d at 230 and *Farmers Feed & Seed*, 344 N.W.2d at 702.

**10.** *See* note 6 *supra* and cases cited therein.

this person could exercise the type of control over the corporation necessary to satisfy the first prong of the test.

Our standard of review for summary judgments requires that the evidence be viewed most favorably to the nonmoving party, KG & E in this case. Although the evidence in the settled record tends to show that any control Jeff Ross may have had over Ross Service was in his capacity as a corporate manager or employee rather than as a shareholder, officer or director, this fact is in dispute.

We noted earlier that Jeff Ross may own *.3125%* of the outstanding corporate stock; that he signed two promissory notes to Dakota State Bank as "treasurer" of Ross Service; and that he was listed as a corporate director on the corporation's annual reports for 1989 and 1990. He also signed the bid submitted to KG & E as the "owner" of Ross Service company. We will therefore view this evidence most favorably to KG & E and treat Jeff Ross as a shareholder, officer and/or director of Ross Service for purposes of applying the two-part test.

## A. *THE SEPARATE CORPORATE IDENTITY PRONG*

▆▆▆ KG & E has advanced four factors it contends justify disregard of the corporate entity: (1) undercapitalization; (2) failure to observe corporate formalities; (3) commingling of Jeff Ross's personal funds with corporate funds; and (4) Jeff Ross's appropriation of corporate property for his personal use. We will now review the evidence in light of these factors to determine whether the first prong of the test has been met.

### 1. *Undercapitalization*

"Shareholders must equip a corporation with a reasonable amount of capital for the nature of the business involved." *Baatz, supra;* and *see Mobridge,* 273 N.W.2d at 132–

33 ("An obvious inadequacy of capital, measured by the nature and magnitude of the corporation's undertaking, is an important factor in denying directors and controlling shareholders the corporate defense of limited liability."); *Curtis v. Feuerhelm,* 335 N.W.2d at 576. (Shareholders who equip corporation with a reasonable amount of capital have assumed appropriate proprietary risk for the nature of the business involved, and the law has not required more).

KG & E argues that because Ross Service was experiencing financial troubles at the time the agreement was entered into, the corporation was undercapitalized. KG & E relies on *Mobridge, supra* as authority for this assertion.[11] That case, however, is clearly distinguishable from the instant case.

First, KG & E has made no assertion, and the record is devoid of any evidence tending to show that Jeff Ross or Ross Service made any representations as to the corporation's financial ability to perform the contract. There is no evidence in the record that KG & E even investigated Ross Service's financial ability to perform.

Second, in April of 1990, Jeff Ross and Edith Ross individually borrowed $20,000 on behalf of the corporation and placed it in Jeff Ross's trucking company account which was also being used as Ross Service's corporate account. The record also shows that prior to entering into the contract with KG & E, Ross Service had over $200,000 in corporate equity. It still had well over $100,000 in corporate equity after entering into the contract.

Third, we note that whether or not Ross Service was experiencing financial difficulties, it is undisputed that Ross Service paid over $500,000 of the $700,000 contract price. Unlike the defendant corporation in *Mobridge,* Ross Service had been in existence for eleven years when it entered into the contract with KG & E. There is no evidence

---

11. In *Mobridge,* the directors of the defendant corporation made various misrepresentations as to the corporation's financial ability to perform a contract which required it to pay $250,000 for plant and equipment in five equal annual installments as well as insurance on the property and payments on a rental building. At the time these misrepresentations were made, the defendant corporation had only $62.08 in its corporate account. We also noted that the legal corporation had only existed for two and one-half years, and was never used for any purpose except the personal immunity of the board members.

that it was formed solely to provide personal immunity to the board members.

■ "Inadequate capitalization means capitalization very small in relation to the nature of the business of the corporation and the risks the business entails measured at the time of formation." *Global Credit Services,* 508 N.W.2d at 843. A corporation which was sufficiently capitalized at formation but which has suffered losses is not necessarily undercapitalized, *Southern Lumber v. M.P. Olson Real Est.,* 229 Neb. 249, 426 N.W.2d 504, 509 (1988), and a mere assertion that the corporation is undercapitalized does not make it so. *Baatz,* 452 N.W.2d at 142.

Finally, "[s]imply identifying evidence of financial problems is insufficient to show that [Ross Service] was undercapitalized." *Bollwerk v. Susquehanna Corp.,* 811 F.Supp. 472, 478 (D.S.D.1993).

There is simply no evidence that Ross Service's capital in whatever amount was inadequate for the operation of business. *Baatz, supra.* "Without some evidence of the inadequacy of the capital, [KG & E] fails to present specific facts demonstrating a genuine issue of material fact." *Id.*

2. *Failure to Observe Corporate Formalities*

■ KG & E contends that Ross Service failed to maintain corporate formalities because corporate meetings were discontinued after 1983. Corporate minutes are also unavailable after that time. When corporate owners, by their own acts, show that they have ignored the corporate entity, the courts may do likewise. *Ethan Dairy Products,* 448 N.W.2d at 230 (citing Annot. *Disregarding Corporate Entity,* 46 A.L.R.3d 428 (1972)).

The evidence in the settled record shows that KG & E was clearly aware that it was dealing with the corporation and not Jeff Ross individually.[12] Despite a lack of certain corporate formalities, the trial court found, and the record shows that Ross Service was operated and conducted business as a separate corporation, that corporate tax returns and annual reports were filed, and that the corporation borrowed money and entered into contracts in its own name.

" 'Genuine corporate organization, even when adopted for the express purpose of avoiding personal liability, is not to be lightly disregarded, and mere failure upon occasion to follow all the forms prescribed by law for the conduct of corporate activities will not justify such disregard.' " *Larson v. Western Underwriters, Inc.,* 77 S.D. 157, 164, 87 N.W.2d 883, 887 (1958) (quoting *P.S. & A. Realties, Inc., v. Lodge Gate Forest, Inc.,* 205 Misc. 245, 127 N.Y.S.2d 315, 324 (1954)). KG & E fails to present a genuine issue of material fact regarding this factor.

3. *Commingling of Personal Funds with Corporate Funds*

KG & E's third contention is that because Jeff Ross commingled his personal funds with those of Ross Service in the trucking company account, Jeff Ross and Ross Service failed to maintain separate identities.[13]

Both sides agree that Ross Service used Jeff Ross's trucking company account at Norwest Bank in Dell Rapids as a depository for Ross Service's corporate funds between April 1990 and January of 1991. They also agree that this commingling was done for the corporation's benefit because Ross Service's regular bank in Colman, South Dakota would have automatically applied any deposits in that account to Ross Service's outstanding loans.

KG & E's argument focuses on Jeff Ross's personal deposits and withdrawals from his trucking company account during the con-

---

12. Jeff Ross did sign the bid as "Jeff Ross, Owner, Ross Service Company." However in accepting the bid, KG & E responded to Ross Service Company, not Jeff Ross personally. In addition, statements of account were sent to Ross Service Company, not to Jeff Ross.

13. KG & E is not arguing that Ross Service voluntarily paid Jeff Ross's individual obligations and thus showed a disregard for the corporate form. Rather, it argues that because his personal withdrawals exceeded his personal deposits into the trucking account, (which he shared with Ross Service from April, 1990 to January of 1991), Jeff Ross, in effect, committed theft against Ross Service. The implications of this claim will be discussed in greater detail below.

tract period between KG & E and Ross Service. In its argument to the circuit court, KG & E specifically alleged that because Jeff Ross's personal withdrawals exceeded his personal deposits in this account between July 1990 and January 1991 by approximately $14,000, he had in effect stolen this money from Ross Service. KG & E claimed that this alleged theft justified piercing the corporate veil of Ross Service to hold Jeff Ross individually liable for the unpaid contract price of about $194,000.

However, Jeff Ross effectively rebutted this argument and demonstrated that there was no issue of material fact by showing: (1) that KG & E was conveniently looking only at the months of July 1990 through January 1991 to establish this $14,000 deficit; and (2) that KG & E had overlooked the fact that he had deposited $14,715.59 into this account on May 29, 1990.

On appeal, KG & E has fashioned a new argument in an effort to show that Jeff Ross's personal withdrawals exceeded his personal deposits. KG & E now claims that by including the $9,700 spent on a Ford truck and trailer, Jeff Ross's withdrawals exceed his deposits in the trucking company account by $9,032.40. We will not consider an argument raised for the first time on appeal. *Oesterreich v. Canton–Inwood Hospital,* 511 N.W.2d 824, 829 (S.D.1994); *Hawkins v. Peterson,* 474 N.W.2d 90, 95 (S.D.1991); *Mayrose v. Fendrich,* 347 N.W.2d 585 (S.D.1984); *Jones v. Sully Buttes School,* 340 N.W.2d 697 (S.D.1983); *Mortweet v. Eliason,* 335 N.W.2d 812 (S.D.1983); *Weaver v. Boortz,* 301 N.W.2d 673 (S.D.1981).

Even if we were to accept KG & E's argument as true, this in and of itself would not justify piercing the corporate veil. At most, these facts (1) demonstrate that Jeff Ross may have taken money or property from Ross Service and (2) may give Ross Service a cause of action against Jeff Ross for the amount of the account deficit. These facts, however, do not demonstrate that Jeff Ross and Ross Service failed to maintain separate identities or that Ross Service was merely the alter ego of Jeff Ross. As to this factor then, KG & E fails to present a genu-ine issue of material fact which would justify piercing the corporate veil.

### 4. *Misappropriation of Corporate Assets for Personal Use*

KG & E's final contention is that Jeff Ross misappropriated corporate property for his personal use. It argues that because Jeff Ross acquired a 1976 Ford truck and trailer through the trucking company account in October of 1990, he took corporate property.

The record clearly shows, however, that (1) Jeff Ross reimbursed Ross Service for these items by depositing $10,000 into the account from a loan he received from Norwest Bank, (2) that the 1976 Ford truck and the trailer were listed on the loan documents as the property being purchased, and (3) that Jeff Ross gave a security interest in this property to Norwest Bank. The claim that Jeff Ross took corporate property for his own use does not appear to be sufficiently supported in the evidence to create a genuine issue of material fact.

Even if we accept these allegations as true, however, these facts do not prove that there was such a unity of interest and ownership that the separate personalities of Jeff Ross and Ross Service were indistinct or non-existent.

Ross Service shareholders, other than Jeff Ross, owned 99.7% of the corporation. If Jeff Ross did, in fact, take the truck and trailer, he took it, ultimately, from the value of the corporation owned by those shareholders. But neither Ross Service, in being wronged, nor Jeff Ross in committing that wrong, engaged in conduct demonstrating a unity of interest and ownership that rendered non-existent the difference between Jeff Ross and Ross Service.

At all times the interests of Jeff Ross and Ross Service remained separate and distinct. Committing a wrong against the corporation neither changed that fact nor justifies disregard of the corporate entity. As to this factor, then, KG & E fails to present a genuine issue of material fact which would justify piercing the corporate veil.

In summary, KG & E has not satisfied the first prong of the test because it has not

presented any genuine issue of material fact showing that Jeff Ross disregarded Ross Service's corporate identity or treated it as his alter ego. Even so, we will briefly analyze the facts as they apply to the second prong of the test.

## B. THE FRAUD, INJUSTICE, OR INEQUITABLE CONSEQUENCES PRONG

█ As we have stated, the piercing doctrine is an equitable remedy. Therefore, the party seeking to pierce the corporate veil must demonstrate that there has been a substantial disregard for the separate corporate identity, and that there is some material equitable reason for the court to hold the shareholder, officer or director personally liable. Such material equitable reason might include fraud, injustice or other inequitable consequences which result from the disregard of the separate corporate identity.

█ Further, the individual who is sought to be charged personally with corporate liability must have shared in the moral culpability or injustice that is found to satisfy the second prong of the test. *Greater Kansas City Roofing,* 2 F.3d at 1053. It has been stated that:

> The alter ego doctrine is not applied to eliminate the consequences of corporate operations, but to avoid inequitable results; a necessary element of the theory is that the fraud or inequity sought to be eliminated must be that of the party against whom the doctrine is invoked, and such party must have been an actor in the course of conduct constituting the abuse of corporate privilege—the doctrine cannot be applied to prejudice the rights of an innocent third party.

*Keating & O'Gradney, supra,* § 41.20 at 639.

█ KG & E contends that Jeff Ross shared in the moral culpability or injustice complained of in that corporate funds were commingled with Jeff Ross's personal funds and Jeff Ross misappropriated corporate funds and took corporate property as his own.[14] To this extent, then, Jeff Ross is not an innocent third party but an actor whose

course of conduct constitutes the claimed abuse of corporate privilege.

Even if we accept these allegations as true, however, a genuine issue of material fact still does not exist. The conduct of Jeff Ross would only amount to fraud or injustice perpetrated on *the corporation,* not on KG & E, a third party corporate creditor.

> The doctrine of alter ego fastens liability on the individual who uses a corporation merely as an instrumentality to conduct his or her own personal business, and *such liability arises from fraud or injustice perpetrated not on the corporation but on third persons dealing with the corporation.* The corporate form may be disregarded only where equity requires the action to assist a third party.

*Keating & O'Gradney, supra,* § 41.10 at 615 (emphasis added). We will not disregard the corporate entity for the benefit of KG & E, a third party corporate creditor, when the only fraud or injustice which may be present was perpetrated on the corporation itself.

KG & E has failed to present any specific genuine issues of material fact which would justify disregarding the corporate entity to hold Jeff Ross individually liable for the corporate debt. Accordingly, the judgment is affirmed.

MILLER, C.J., and HENDERSON and AMUNDSON, JJ., concur.

SABERS, J., dissents.

LOVRIEN, Circuit Judge, for WUEST, J., disqualified.

SABERS, Justice (dissenting).

The conference opinion strains to make findings and reach conclusions to avoid the fact that a genuine issue of material fact exists. If these findings and conclusions had been appropriately reached by the trial court *after a trial (or by a jury),* I could concur. This, however, is summary judgment. On this muddled record, how can Jeff Ross, who signed the bid as owner, show that no genuine issues of material fact exist? That is his

---

14. The facts concerning the allegations of commingling funds and misappropriation of assets were discussed in detail above and need not be repeated here.

burden and he has failed to meet that burden. *Dept. of Rev. v. Thiewes,* 448 N.W.2d 1, 2 (S.D.1989) (citing *Wilson v. Great N. Ry. Co.,* 83 S.D. 207, 212, 157 N.W.2d 19, 21 (1968)).