1996 SD 29

**STACEY TAYLOR TRIPPET SPECIAL TRUST, Terry V. Trippet II Special Trust, and T. Stuart Ducote as Trustee, Plaintiffs and Appellants,**

v.

**Bryan BLEVINS, Brian Hagg, Trustee, Ray A. Jilek, Terra Industries, Inc., Black Hills Conference Center, Inc., Defendants and Appellees,**

and

**The State of South Dakota, Defendant.**

No. 19276.

Supreme Court of South Dakota.

Considered on Briefs Feb. 14, 1996.

Decided March 20, 1996.

Thomas E. Brady, Spearfish, for plaintiffs and appellants.

Courtney R. Clayborne, Johnson Huffman, Rapid City, for appellees, Bryan Blevins, Brian Hagg, Ray A. Jilek, and Terra Industries, Inc.

Jon Mattson, Mattson & Rachetto, Deadwood, for appellee Black Hills Conference Center.

GILBERTSON, Justice

[¶ 1] Trippet Trusts appeals the circuit court's grant of summary judgment concluding Trippet Trusts has no interest in the 16–acre tract of real property at issue. We affirm.

## FACTS AND PROCEDURE

[¶ 2] In March 1990, William Martindale acquired through quit-claim and warranty deeds a fee simple interest in a 16–acre tract of real property located in Deadwood, SD. Martindale recorded both deeds in the Lawrence County Register of Deeds Office on April 3 and April 6, 1990, respectively.

[¶ 3] On April 2, 1990, Martindale entered into an agreement entitled "Acquisition and Development Agreement" (Agreement) with Terry Trippet, Linda Benson and two South Dakota corporations. Trippet, Benson, and the two corporations are referred to collectively in the Agreement as the "Trippet Group." The Agreement was recorded in the Lawrence County Register of Deeds Office on April 25, 1990. Because the language of this Agreement defines the interests of its signatories and controls the outcome of this appeal, it will be set forth in its entirety:

> This letter agreement (the "Agreement") shall serve to set forth the terms and conditions of our agreement to acquire, develop and operate certain real property and improvements commonly known as the 16 Acre Tract located in Deadwood, Lawrence County, South Dakota (the "Property"). For and in consideration of the mutual covenants hereinafter set forth and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:
>
> 1. On March 30, 1990, Martindale acquired the Property consisting of approximately 16 acres, more or less, located in Deadwood, South Dakota (the "16 Acre Tract"). The 16 Acre Tract is more particularly described on *Exhibit "A"* attached hereto and incorporated herein for all purposes.
>
> *Simultaneously with the execution of this Agreement, the parties agree to form a South Dakota corporation to be*

utilized to conduct operations at the Property. (The "16 Acre Tract Operating Entity"). The Big A Auto Parts Operating Entity shall develop and operate the Property in accordance with a development plan to be mutually agreed to by the parties in writing.

2. Martindale shall own 33.33% of the issued and outstanding shares of stock of the 16 Acre Tract Operating Entity and *the Trippet Group shall own 66.67% of the issued and outstanding shares of stock of the 16 Acre Tract Operating Entity.* Martindale, Benson and Trippet shall be the initial members of the board of directors of the 16 Acre Tract Operating Entity. All decision making power of the 16 Acre Tract Operating Entity shall be vested in its board of directors. Upon formation of the 16 Acre Tract Operating Entity, the parties agree to file any and all appropriate documentation with the Internal Revenue Service necessary for the 16 Acre Tract Operating Entity to elect "S Corp" status under Section 1361 *et seq.* of the Internal Revenue Code of 1986, as amended.

3. Martindale shall be responsible for the payment of all costs and expenses necessary to acquire, develop and maintain the Property, including, without limitation, payment of the cash portion of the purchase price and all debt service payments due pursuant to the Purchase Agreement. In addition, Martindale agrees to pay the Trippet Group a developer fee in the amount of $50,000.00 (the "16 Acre Tract Developer Fee"). Fifty percent (50%) of the 16 Acre Tract Developer Fee shall be due and payable on the date the parties mutually agree to commence development of the Property. The balance of the 16 Acre Tract Developer Fee shall be due and payable by Martindale at the time of the initial distribution of Net Revenue (as hereinafter defined) generated from the Property (all costs and expenses paid by Martindale in order to acquire, develop and maintain the Property, including, without limitation, the 16 Acre Tract Devel-

oper Fee, are hereinafter collectively referred to as the "16 Acre Tract Development Costs"). In no event shall Martindale's obligation to pay the 16 Acre Tract Development Costs exceed the amount agreed to by the parties pursuant to the development plan described above. Until such time as Martindale has recovered 150% of the 16 Acre Tract Development Costs, Martindale shall be entitled to receive 66.67% of the Net Revenue generated from the Property, and the Trippet Group shall be entitled to 33.33% of the Net Revenue generated from the Property. At the time Martindale has recovered 150% of the 16 Acre Tract Development Costs, Martindale shall be entitled to receive 33.33% of the Net Revenue generated from the Property and the Trippet Group shall be entitled to receive 66.67% of the Net Revenue generated from the Property. *In addition, at the time Martindale has been released from all personal liability arising out of obligations incurred by Martindale pursuant to the acquisition of the Property, Martindale shall assign, transfer and convey all of his right, title and interest in and to the Property to the 16 Acre Tract Operating Entity.* In connection therewith, Martindale agrees to execute any and all documentation reasonably requested by representatives of the 16 Acre Tract Operating Entity to effectuate the transfer and assignment of the Property. All costs incurred in the transfer of the Property shall be paid by the Big A Auto Parts Operating Entity.

4. Notwithstanding the terms and conditions of Section 2 above to the contrary, until such time as Martindale has recovered 150% of the 16 Acre Tract Development Costs (a) all decisions by the board of directors of the 16 Acre Tract Operating Entity (to include all development, operating and budgeting decisions) shall require the unanimous written consent of all of the members of the board of directors;

and (b) all shares of stock of the 16 Acre Tract Operating Entity issued to the Trippet Group shall be pledged to Martindale to secure repayment of the 16 Acre Tract Development Costs paid by Martindale. In connection therewith, the Trippet Group agrees to execute any and all documentation reasonably requested by Martindale to effectuate the pledge of the Trippet Group shares of stock to Martindale.

5. For purposes of this Agreement, the term "Net Revenue" shall include one or any combination of the following: (a) Net Operating Income; and/or, (b) Net Sales Proceeds.

"Net Operating Income", for any period, shall mean all Gross Receipts less Expenses. Gross Receipts shall mean the gross revenues generated at the Property from all sources, including, without limitation, all rentals, gaming revenue, fees, payments, reimbursements (including all reimbursements by tenants, lessees, licensees and other users of the Property or from rental interruption or similar insurance other than casualty insurance), income or interest. Expenses shall mean the total bona fide and normal operating business expenditures incurred to generate Gross Receipts including (i) insurance premiums for insurance carried in connection with, and applicable to the Property; (ii) real estate taxes; (iii) operating, marketing, cleaning and repair of the Property which are in the nature of items properly chargeable against income according to generally accepted accounting principles, including wages and payroll costs, maintenance costs, costs of services, water and sewer charges and assessments, license fees and business taxes; (iv) regularly scheduled payments actually made on any indebtedness encumbering the Property and (v) legal fees. Notwithstanding any of the foregoing, Expenses shall not include any income taxation, depreciation, or other non-cash deductions of the 16 Acre Tract Operating Entity for federal income tax purposes.

The term "Net Sales Proceeds" shall mean the following: (1) with respect to a sale, transfer, assignment or conveyance of any legal, equitable or beneficial interest in all or any portion of the Property the amount by which (A) the total purchase price paid to the parties by any purchaser for the Property or any portion thereof, exceeds (B) the sum of (i) any reasonable and customary closing costs pertaining to such sale; (ii) any reasonable real estate commissions or brokers fees; and (iii) the outstanding principal balance of any loan encumbering the Property or any portion thereof. (2) With respect to a refinancing of all or any portion of the Property by placing a lien thereon (a "Refinancing"), the gross proceeds of such Refinancing, less the following: (i) reasonable fees, including commitment fees, brokerage fees and finance charges, paid by the 16 Acre Tract Operating Entity or the parties or disbursed out of the proceeds of such refinancing in connection with the Refinancing; (ii) reasonable closing costs paid by the 16 Acre Tract Operating Entity or the parties, including escrow fees, recording fees, attorney fees, title insurance premiums and surveyors' fees; (iii) the outstanding principal balance of any indebtedness due on the Property or on any portion thereof, together with accrued but unpaid interest thereon; and (iv) any reasonable out-of-pocket expenses incurred by the 16 Acre Tract Operating Entity or the parties. (3) With respect to an exchange of all or any portion of the Property for property of any kind (an "Exchange"), the value (as specified in the agreement for such Exchange) of the Property less the following: (i) real estate or brokerage commissions; (ii) reasonable closing costs paid by the 16 Acre Tract Operating Entity or the parties, including escrow fees, recording fees, attorneys fees, title insurance premiums and surveyors' fees; (iii) the outstanding principal balance of any indebtedness due on the Property or any portion thereof, together with accrued but unpaid interest due thereon; and (iv) any reasonable out-of-pocket ex-

penses incurred by the 16 Acre Tract Operating Entity of [sic] the parties. (4) With respect to a condemnation or taking or [sic] all or any portion of the Property as a result of the exercise of the power of eminent domain, including a voluntary sale either under the threat of condemnation or while an action or proceeding is pending for the purpose of such taking (a "Condemnation"), the gross proceeds paid by the condemning authority as a result of the Condemnation, less the following: (i) all reasonable costs and expenses paid by the 16 Acre Tract Operating Entity or the parties in connection with the condemnation, including reasonable attorneys' fees; (ii) costs and expenses paid by the 16 Acre Tract Operating Entity or the parties in restoring and/or repairing the Property following the Condemnation; (iii) in the event of a sale in lieu of Condemnation, the reasonable closing costs paid by the 16 Acre Tract Operating Entity or the parties including escrow fees, recording fees, attorney's fees, title insurance premiums and surveyors' fees; and (iv) any portion of such proceeds required to be applied against the outstanding principal balance of any indebtedness due on the Property or any portion thereof, together with the applicable portion of accrued but unpaid interest due thereon. (5) With respect to insurance policies, the gross proceeds of such insurance policies covering the Property or any portion thereof (to the extent such insurance proceeds are made available to restore or rebuild the Property or any portion thereof) in excess of the reasonable costs of repair, restoration or rebuilding of the Property or any portion thereof, less reasonable costs incurred by the 16 Acre Tract Operating Entity or the parties in collecting such proceeds.

6. On or before May 1, 1990, Martindale agrees to reimburse the Trippet Group for certain expenses incurred by the Trippet Group in the acquisition of the Property pursuant to the Schedule of Costs and Expenses attached hereto as *Exhibit "B"* and incorporated herein for all purposes.

7. Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by arbitration in accordance with the rules of the American Arbitration Association, and judgment upon the award rendered by the arbitrators may be entered in any court having the jurisdiction thereof.

8. Simultaneously with the creation of the 16 Acre Tract Operating Entity to be utilized by the parties to operate the Property, the parties agree to execute a buy-sell agreement or similar stock transfer restriction agreement upon terms and conditions mutually acceptable to the parties.

9. *Miscellaneous.*

   (a) All notices required or permitted by this Agreement shall be in writing and shall be deemed delivered when placed in an official receptacle of the United States Mail, postage prepaid, and sent by registered or certified mail, return receipt requested, addressed in the case of Martindale to ..., and in the case of the Trippet Group to.... Written notices given other than as set forth above shall be deemed given when actually received.

   (b) In the event any party to this Agreement is required to initiate, prosecute or defend any legal action or proceeding to enforce its rights under the terms of this Agreement, then the prevailing party in such legal action or proceeding shall be entitled to an award against the non-prevailing party for its reasonable attorneys' fees and other costs incurred in such legal action or proceeding.

   (c) The failure of either party to seek redress for violation or to insist upon the strict performance, of any covenant, agreement, provision or condition of this Agreement shall not constitute a waiver thereof.

   (d) This Agreement shall constitute the entire agreement between the par-

ties hereto, and no modification thereof shall be effective unless made by a supplement agreement in writing executed by the parties. Should any part of this Agreement be rendered void, invalid or unenforceable by any court of law, such a determination shall not render void, invalid or unenforceable any other part of this Agreement.

(e) This Agreement shall [sic] governed by and construed under the laws of the State of Texas, and all duties and obligations under this Agreement shall be performable in Dallas County, Texas.

(emphasis added).

[¶ 4] In May 1990, Benson transferred her one-third interest in the Agreement to Trippet with the approval and consent of Martindale. In July 1990, Trippet transferred his two-thirds interest in the Agreement to his children's irrevocable trusts (Trippet Trusts), with the approval and consent of Martindale. In August 1990 and July 1991, Martindale conveyed by two warranty deeds a one-third interest in the real estate to Craig Hayes. Both deeds were recorded by Hayes with the Lawrence County Register of Deeds Office. Martindale conveyed to Terra Industries, Inc. a two-thirds interest in the real estate by a warranty deed dated February 1994. Terra recorded its interest in the real estate and subsequently conveyed it by quit claim deed to Ray Jilek and to Brian Hagg, as trustee for Bryan Blevins. This deed was recorded in the Lawrence County Register of Deeds Office. In October 1994, Hayes conveyed his one-third interest in the property to Black Hills Conference Center, Inc., by warranty deed. This deed was recorded in the Lawrence County Register of Deeds Office.

[¶ 5] Trippet Trusts filed a declaratory judgment action pursuant to SDCL 21–24–1 to determine the parties' relative rights and interests regarding the 16–acre tract of real estate. Trippet Trusts claimed the Agreement provided them ownership to an undivided two-thirds interest in the property and entitlement to exercise a right to purchase the remaining one-third undivided interest.

Defendants, Blevins, Hagg, Jilek, and Terra, filed a motion for summary judgment and supporting brief, in which Black Hills Conference Center joined. The circuit court granted summary judgment to Defendants and denied summary judgment to Trippet Trusts. Trippet Trusts appeal the circuit court's order raising the following issues:

1. Whether the trial court erred in granting summary judgment to Defendants thereby declaring Trippet Trusts had no interest in the 16–acre tract?

2. Whether the trial court erred in not granting summary judgment to Trippet Trusts thereby declaring Defendants' interests in the property void, or in the alternative, subject to Trippet Trusts' interests in the 16–acre tract?

## STANDARD OF REVIEW

[¶ 6] Our standard of review on a motion for summary judgment is well established. In reviewing a grant or denial of summary judgment,

'we must determine whether the moving party demonstrated the absence of any genuine issue of material fact and showed entitlement to judgment on the merits as a matter of law. The evidence must be viewed most favorably to the non-moving party and reasonable doubts should be resolved against the moving party. The non-moving party, however, must present specific facts showing that a genuine, material issue for trial exists. Our task on appeal is to determine whether a genuine issue of material fact exists and whether the law was correctly applied. If there exists any basis which supports the ruling of the trial court, affirmance of a summary judgment is proper.'

*Bankwest, NA v. Groseclose*, 535 N.W.2d 860, 863 (S.D.1995) (quoting *Easson v. Wagner*, 501 N.W.2d 348, 350 (S.D.1993)).

## ANALYSIS AND DECISION

[¶ 7] Trippet Trusts' argument to this Court focuses on whether Defendants were bona fide purchasers who purchased without notice of Trippet Trusts' interest in the property. Questions that must be answered before looking at any subsequent purchasers,

however, are what exactly are Trippet Trusts' interests and how were they acquired? The answers can be found in the language of the "Acquisition and Development Agreement" set forth above.

[¶ 8] Trippet Trusts claim the Agreement is a contract setting forth rights and obligations of the parties who made the Agreement. SDCL 53-1-1. What the Agreement is not, however, is a conveyance of any real property interest to Trippet Trusts. Neither is Benson's transfer of her interest to Trippet a conveyance of real property as Benson, by the same Acquisition and Development Agreement, did not own an interest in the real property. When the parties entered into this Agreement, Martindale was the sole owner in fee simple of the entire 16-acre tract of real estate. This fact is referenced in both the Agreement and notice of same filed with the Lawrence County Register of Deeds Office.

[¶ 9] Under SDCL 43-4-1 a transfer of realty occurs only by the act of the parties, which act never occurred here. A grant does not take effect until delivery by the grantor. SDCL 43-4-7. Further, under SDCL 43-4-8 a grant cannot be delivered conditionally to a grantee. "Delivery ... is necessarily absolute; and the instrument takes effect thereupon discharged of any condition on which the delivery was made."

[¶ 10] Trippet Trusts' reliance upon SDCL 43-28-17 as authority for the proposition that the document in question constitutes a conveyance to Trippet simply begs the question. That statute is a priority statute determining that the grantee who files a conveyance of real property takes over subsequent attempted transfers by the original grantor which are void. For SDCL 43-28-17 to apply there must be a "conveyance" to the grantee to begin with, which is the issue now before us.

[¶ 11] The purpose of the Acquisition and Development Agreement is set forth in subparagraph one. The agreement reflects an intent of its parties to form a South Dakota corporation to develop and operate the real property. A South Dakota corporation was incorporated as intended by the parties. This corporation is Ridgeview Corporation

and the Secretary of State issued its certification of incorporation on April 6, 1990. The Agreement further sets forth the percentage of shares in the corporation each of the parties would own. Under the Agreement, the Trippet Group had a contractual right to receive 66.67 percent of the corporate stock. However, no shares of stock have ever been issued by Ridgeview Corporation.

[¶ 12] Although the Agreement indicates that in subparagraph three, upon the satisfaction of certain conditions precedent, Martindale will transfer his property interest in the 16-acre tract to Ridgeview Corporation, the Agreement by itself does not transfer any interest. SDCL Ch. 43-4.

[¶ 13] SDCL 43-25-16 states that "[a]n instrument purporting to be a grant of real property, to take effect upon condition precedent, passes the estate upon the performance of that condition." SDCL 43-4-8 provides that any conditional delivery of a grant in real property is ineffective. Here the conditions precedent had not occurred and thus there could be no delivery of any kind. Given this, under SDCL 43-25-32 a grantor reserves in himself the power to revoke or modify the instrument affecting the real property with any subsequent grant revoking the original instrument.

[¶ 14] Further, had the conditions precedent been met and Martindale had transferred his ownership interest under the Agreement, the corporation would own the property, not Trippet. South Dakota law recognizes a corporation as a legal entity, separate from its officers, directors, and shareholders, until there is sufficient reason to the contrary. *Kansas Gas & Elec. Co. v. Ross*, 521 N.W.2d 107, 111 (S.D.1994); *Baatz v. Arrow Bar*, 452 N.W.2d 138, 141 (S.D. 1990). The Trippet Group had the potential to own shares in the corporation, but the Trippet Group would not have owned the property under any circumstances outlined in the Agreement.

[¶ 15] Trippet Trusts have not presented any "specific facts showing that a genuine, material issue for trial exists" nor has this Court found a genuine material issue of fact exists. We conclude Defendants are entitled

to judgment as a matter of law. The circuit court's order granting summary judgment for Defendants is affirmed.

[¶16] Our determination of Issue 1 makes discussion of Issue 2 unnecessary.

[¶17] MILLER, C.J., and SABERS, AMUNDSON and KONENKAMP, JJ., concur.